**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**$557,933.89, MORE OR LESS, IN U.S. FUNDS, Seized from Ramis A. Mercado–Filpo, and All Proceeds Traceable Thereto, Defendant,**

**Ramis Mercado, Claimant–Appellant.**

**Docket No. 00–6261.**

United States Court of Appeals, Second Circuit.

Submitted: May 4, 2001.
Decided: March 26, 2002.

70

J.C. Elso, Miami, FL, for the appellant.

Sarah J. Lum, Assistant United States Attorney, Brooklyn, NY (Varuni Nelson, Arthur P. Hui, on the brief), for Loretta E. Lynch, United States Attorney for the Eastern District of New York, for the appellee.

Before: MESKILL, KEARSE, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Following a jury trial, claimant Ramon Mercado appeals a judgment of civil forfeiture entered by the United States District Court for the Eastern District of New York (Gleeson, *J.*) with respect to the defendant funds, which were seized from claimant after a routine security search at LaGuardia Airport in New York. The funds, well over a half-million dollars in value, consisted mostly of small-denomination money orders with no payor or payee information, purchased over the span of two to three days. The government asserted that these money orders were purchased in such a way as to avoid currency transaction reporting requirements, in violation of 31 U.S.C. § 5324(a) (1994), thus making them subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) (2000). The government also claimed, largely based on the additional evidence of a positive canine alert to the money orders for narcotics residue and other evidence of claimant's involvement in narcotics trafficking, that the money orders were proceeds of drug trafficking subject to forfeiture under 21 U.S.C. § 881(a)(6) (1994) (amended 2000) and were also involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957(a) (2000). Claimant Mercado argues on appeal that much of the evidence presented by the government at trial was obtained in violation of the Fourth Amendment and that without this evidence the government failed to meet its burden of establishing

probable cause for the forfeiture of the defendant funds. In addition, claimant argues that the government should be barred from forfeiture because of the allegedly unreasonable delay between the seizure of the funds at LaGuardia and the institution of the forfeiture proceedings. Finding no reversible error below, we affirm.

## BACKGROUND

The following facts are undisputed except where otherwise noted. On the evening of June 8, 1994, Mercado passed through an American Airlines security checkpoint at LaGuardia Airport in New York, on his way to board a flight to Miami. After passing his briefcase through the carry-on luggage scanner, security personnel for American could not see the contents of the briefcase. The security officer asked Mercado if he would open his briefcase for inspection, and Mercado complied. Upon opening the briefcase, it could be seen that the briefcase contained a number of money orders. The American security personnel detained the suitcase with the money orders while contacting the Port Authority Police ("PAPD"), who have primary law enforcement jurisdiction over LaGuardia. Detective Robert Martin arrived within a few minutes.

When Martin arrived, he asked Mercado if he was carrying a large number of money orders. After Mercado responded affirmatively, Martin—with Mercado's consent, he claims, although Mercado disputes this—opened the briefcase and saw the money orders. Martin "thumbed through" the orders and was able to see that they were unsigned, undesignated, and in small denominations (less than $1000 each). Martin called DEA agent Tony Garifo and told him what he had discovered. Garifo

asked Martin to hold on to the briefcase and its contents.

Martin thereupon informed Mercado that he would be taking the briefcase and the money orders to the PAPD office near LaGuardia. Martin invited Mercado to accompany him. According to Martin, this was because Mercado had told him that the money orders did not belong to him but rather to his boss, Isidro Castro, and Martin told Mercado that at PAPD offices he could call Castro to see if Castro could provide documentation of the money orders' "legitimacy." Mercado denies that he ever told Martin that the money orders were anyone's other than his own. Following an interview of roughly twenty minutes, Mercado was given a receipt for the money orders and driven back to LaGuardia, where he caught his flight to Miami.

The next day, Detective Robert Schneider of the Nassau County Sheriff's Department, who was on assignment to the DEA, was summoned to the DEA office along with his canine partner, a German Shepherd named Brent. Schneider and Brent were asked to perform a "canine sniff" of the money orders, which had apparently been transported from the PAPD offices to the DEA offices at John F. Kennedy Airport, also in New York. The canine sniff was conducted by leading Brent past several similar plastic bins; Brent alerted to the bin containing the money orders seized from Mercado, indicating that the dog detected some form of narcotics residue present.

On July 11, 1994, the DEA instituted administrative forfeiture proceedings, pursuant to 21 U.S.C. § 881(d) (2000) and 19 U.S.C. § 1607(a)(4) (2000),[1] by sending a notice of seizure to Mercado and by publishing the notice. Mercado, at that point represented by counsel, filed a claim shortly thereafter, but this claim was neither properly executed nor accompanied by either a cost bond or an affidavit of indigency as required by 19 U.S.C. § 1608 (2000). On August 22, 1994, Mercado refiled his claim, which now included a verified statement by Mercado that he was the "custodian and/or owner" of the money orders, but which still lacked the required bond. The cost bond was finally filed with the DEA on January 24, 1995.

Some eight months later, on September 29, 1995, the United States filed a verified complaint, subsequently amended on October 27, 1995, commencing the instant civil forfeiture proceedings in the district court. The complaint alleged that the money orders were subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as a result of their involvement in "structuring violations"— i.e., structuring financial transactions so as to avoid the currency transaction reporting ("CTR") requirements of 31 U.S.C. §§ 5313(a) and 5325 (1994)—in violation of 31 U.S.C. § 5324. (The CTR provisions require financial institutions to report to the Secretary of Treasury transactions above certain threshold amounts—e.g., over $3000 in the case of § 5325.) The complaint was verified by Postal Inspector James Callery, who had investigated the purchase dates and locations of the money

---

**1.** Section 881 of Title 21 covers civil forfeitures for drug-related offenses. Subsection (d) specifically incorporates (and applies to property forfeitable under § 881(a)) the procedures relating to customs seizures outlined in 19 U.S.C. §§ 1602–1621, which authorize the initiation of administrative forfeiture proceedings by publication of notice of seizure when the goods seized are, *inter alia*, "mone-

tary instrument[s]." 19 U.S.C. § 1607(a)(4). Failure of any interested person to file a claim on the seized property pursuant to § 1608 results in an administrative forfeiture of the property, which has "the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding in a district court of the United States." 19 U.S.C. § 1609 (2000).

orders based on the information taken from the face of the money orders. According to the complaint, the money orders (over 900 in total) were purchased over the span of three days from over 40 locations in the New York metropolitan area, with no individual money order exceeding $1,000 in value.

Claimant filed an answer to the complaint on November 22, 1995, and, in accordance with Supplemental Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims, also filed a verified claim [2] again stating that he was the "custodian and/or owner" of the defendant funds. The claim did not, however, include any statement regarding Mercado's authorization to make the claim on behalf of another person entitled to possession. Mercado also filed answers to the government's interrogatories in which, for all practical purposes, he asserted the Fifth Amendment privilege against self-incrimination to every interrogatory.

In March 1996, claimant moved, pursuant to Fed.R.Crim.P. 41(e) and Fed. R.Civ.P. 12(b), for suppression of evidence obtained by the government as a result of the seizure at LaGuardia, which claimant asserted was in violation of the Fourth Amendment. Claimant further moved for dismissal of the complaint and return of the defendant funds on the ground that, without this evidence, the government lacked probable cause for forfeiture, and additionally that the complaint failed to satisfy the pleading requirements of Supplemental Rule E(2)(a). The government cross-moved to strike Mercado's claim, initially as a discovery sanction (for his failure to answer the government's interrogatories) but also later (in a supplemental letter brief) for lack of statutory standing due to claimant's failure to comply with Supplemental Rule C(6)'s requirement that (as the rule then stood) "[i]f the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that the agent, bailee, or attorney is duly authorized to make the claim."

In opposing claimant's motion, the government submitted an affidavit from DEA Agent Garifo describing the events at La-Guardia. Claimant countered with his own affidavit. The motions were referred to Magistrate Judge Steven Gold. Without holding an evidentiary hearing, Magistrate Judge Gold issued his Report and Recommendation on February 28, 1997, recommending (1) that claimant's motion for suppression of evidence and dismissal of the complaint for failure to establish probable cause be denied, finding no Fourth Amendment violation in the seizure at La-Guardia; (2) that claimant's motion to dismiss for failure to meet the Rule E pleading requirements be denied; and (3) that the government's motion to strike Mercado's claim for his Fifth Amendment assertions be denied without prejudice to renewal. On the suppression motion, the Magistrate Judge decided no evidentiary hearing was required because "Mercado has failed to point to any factual dispute pertinent to this Court's decision." Report & Recommendation, slip op. at 4. As to Mercado's Fifth Amendment assertions, the Magistrate Judge, citing our decision in *United States v. 4003–4005 5th Ave.,* 55 F.3d 78 (2d Cir.1995), noted the tensions inherent in civil forfeiture proceedings between the normal civil discovery process and the claimant's concerns about self-

---

**2.** Supplemental Rule C was amended in 2000 to change the term "claim" to "statement of interest in or right against the property." Supplemental Rule C(6)(a). No substantive change was thereby effected. *See* Supplemental Rule C advisory committee note to the 2000 Amendments.

incrimination in possible criminal proceedings arising from the conduct giving rise to the government's forfeiture claim. Report & Recommendation, slip op. at 13; *see also 4003–4005 5th Ave.*, 55 F.3d at 83 (noting that "[t]he claimant thus 'faces a dilemma: remain silent and allow the forfeiture or testify against the forfeitability of his property and expose himself to incriminating admissions.'") (quoting *United States v. $250,000 in U.S. Currency,* 808 F.2d 895, 900–01 (1st Cir.1987)). To accommodate this tension, the Magistrate Judge recommended that Mercado be given the opportunity to make a motion for relief or to answer the interrogatories in light of the suppression motion outcome, without prejudice to the government's renewal of its motion at a later time. (The Magistrate Judge did not specifically address the government's claim regarding claimant's failure to comply with Supplement Rule C(6).)

Following a timely filing of objections by claimant (none were filed by the government with respect to its motions), the district court adopted all of the Magistrate Judge's recommendations. *United States v. $557,993.89, More or Less, in U.S. Funds,* No. 95–CV–3978, 1997 WL 1068678 (E.D.N.Y. Apr.16, 1997) (*"Mercado I"*). The district court found that during the scope of a proper airport security search, sufficient characteristics of the money orders came into plain view to give the Port Authority Police probable cause to seize the money orders. *See id.* at *2–*3 ("Once the airport security personnel legally made the discovery of the money orders, the Port Authority police had probable cause to legally seize them."). The district court did not specifically address the detention of the money orders by airport security

personnel pending the arrival of Detective Martin. Like the magistrate judge, the district court declined to hold an evidentiary hearing on the ground that the decision could be reached "without relying on any of the facts [claimant] alleges are in dispute." *Id.* at *3 n. 3.

In August 1997, claimant moved for a stay of discovery in order to preserve his Fifth Amendment right against self-incrimination. The government opposed and renewed its motions to strike. The district court granted the government's motion to strike the claim for Mercado's failure to satisfy the requirements of Rule C(6), but did so without prejudice to claimant's refiling. *See United States v. $557,933.89, More or Less, in U.S. Funds,* No. 95–CV–3978, 1998 WL 817651, at *2–*3 (E.D.N.Y. Mar.2, 1998) (*"Mercado II"*). The district court, however, granted claimant's request for a stay of proceedings until June 1999 in order to allow for the running of the five-year limitations period applicable to structuring violations.[3] *Id.* at *3–*4. Claimant then filed, in March 1998, an amended claim asserting that he was the "owner" of the defendant funds.

In July 1999, in the United States District Court for the Middle District of Florida, Mercado pled guilty to one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, a conviction for which he was sentenced principally to 188 months' imprisonment. Subsequently, in January 2000, the government was granted leave to amend its complaint to add two more grounds for forfeiture of the defendant funds: (1) under 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957(a); and (2) under 21 U.S.C.

---

**3.** There is no specific statute of limitations for structuring violations under 31 U.S.C. § 5324, hence the five-year period generally applicable to federal crimes applies. *See* 18 U.S.C. § 3282 (2000).

§ 881(a)(6), as property furnished or intended to be furnished in exchange for a controlled substance. The "specified unlawful activity" that formed the basis for the money laundering claims under §§ 1956–1957 was narcotics trafficking. The new grounds were based not only on the original canine sniff by Brent and claimant's recent guilty plea, but also on a declaration submitted by Customs agent Carlos Mazza. In the declaration, Agent Mazza described his undercover conversations in 1993 with Mercado in which Mercado allegedly claimed to have been in control of several hundred kilograms of cocaine to be shipped into the United States. Claimant filed his answer to the second amended complaint on July 28, 2000, denying that the government had probable cause for forfeiture and asserting as defenses (1) the alleged unlawfulness of the initial seizure; (2) the allegedly unreasonable delay between seizure and commencement of judicial forfeiture proceedings; and (3) the unconstitutionality of the forfeiture under the Excessive Fines Clause of the Eighth Amendment.[4]

In April 2000, at his deposition, claimant again asserted his Fifth Amendment right against self-incrimination, this time with respect to the new allegations based on Agent Mazza's declaration. In addition, Mercado only claimed ownership of approximately half of the funds, declaring that the rest belonged to Isidro Castro. On June 30, 2000, the government again moved to strike Mercado's claim for lack of standing, arguing that his deposition testimony and inconsistent assertions regarding ownership belied his claim to be "owner" of the defendant funds. On July 28, 2000, after oral argument, the district court denied the government's motion; the

record does not reflect the district court's reasons.

Trial began on July 31, 2000, with the court sitting out of the presence of the jury to determine if the government could meet its initial burden to establish probable cause for forfeiture of the defendant funds. Testimony was provided by Detective Martin, Inspector Callery, and Detective Schneider. At oral argument, claimant not only pressed the lack of probable cause by the government, but renewed his motion to suppress and further asserted that the government's delay in filing the complaint barred the forfeiture. The next morning, August 1, 2000, the district court announced its decision (1) reaffirming its earlier suppression ruling and (2) finding that the government had established probable cause for forfeiture on all three of its theories (structuring, narcotics trafficking, and money laundering). The court does not appear to have addressed Mercado's claim of unreasonable delay.

Testimony continued on August 1 and 2, 2000. In addition to repeat performances by the witnesses testifying at the probable cause hearing, the jury also heard from DEA Agent Mazza regarding his alleged undercover dealings with the claimant, as well as from the claimant himself. Claimant testified that the funds in question were largely winnings he had received from a lottery in the Dominican Republic and had "invested" with Isidro Castro. Claimant testified that on the morning of the day of the seizure, Castro had given him his invested funds plus additional funds as a loan so that claimant could start a grocery store in southern Florida.

The jury was charged with four questions. The first, to which claimant object-

---

**4.** Claimant has not pursued any Eighth Amendment theories on this appeal, nor did he appear to do so before the district court.

ed, was whether he had proven, by a preponderance of the evidence, "that he was the owner of the monetary instruments seized from him." The remaining three questions were whether claimant had proven, again by a preponderance, "that the monetary instruments seized from him were not involved in" the offenses of structuring, drug trafficking, and money laundering, respectively. The jury answered "no" to all questions, and the district court entered a judgment of forfeiture in favor of the government on August 9, 2000. This timely appeal followed.

## DISCUSSION

On appeal, Mercado raises essentially two points of error with regards to the judgment of forfeiture below. First, Mercado asserts, the seizure and subsequent searches of his briefcase at LaGuardia Airport violated the Fourth Amendment, and thus any evidence obtained from those violations should have been suppressed from the forfeiture proceeding. Absent the tainted evidence, Mercado claims, the government failed to demonstrate probable cause for the forfeiture and so its forfeiture complaint should have been dismissed. Second, Mercado argues that the complaint should have been dismissed in any event because the government did not, as Mercado sees it, institute forfeiture proceedings promptly after seizing the money orders. We address each of these arguments in turn, but first we discuss a preliminary issue related to standing.

## I. *Standing*

As mentioned above, the district court submitted to the jury, at the government's urging and over Mercado's objection, the question of whether Mercado had "proven by a preponderance of the evidence that he was the owner of the monetary instruments seized from him." The government had argued, and the district court apparently accepted, the proposition that the claimant was asserting an "innocent owner" defense and that therefore the jury had to determine claimant's status as owner of the funds. Both the government and the district court were mistaken, although the error was harmless. To understand why, we must briefly review the forfeiture statutes as they then operated.[5]

Both civil forfeiture statutes invoked by the government in this case—18 U.S.C. § 981 and 21 U.S.C. § 881—involved the same basic principles and operated in the same way. Both declared any property which is involved in certain types of illegal transactions—typically by being proceeds from or somehow facilitating those transactions—to be forfeitable to the government. Indeed, both statutes declared that title to property so involved vests in the United States "immediately" upon the commission of the illegal transaction that gave rise to the forfeiture. *See* 18 U.S.C. § 981(f) (2000); 21 U.S.C. § 881(h) (1994); *see also United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 123–29, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (although the government's title must be perfected through administrative or judicial forfeiture pro-

**5.** The Civil Asset Forfeiture Reform Act of 2000, Pub.L. 106–185, 114 Stat. 202 (2000), consolidated and dramatically overhauled the procedures for civil judicial forfeiture proceedings. Among the most significant changes was to place on the government the burden of proving, by a preponderance of the evidence, its right to forfeiture of an asset. *See* 18 U.S.C. § 983(c)(1) (2000). As indicat-

ed below, the Act also consolidated various "innocent owner" defenses into a new provision, 18 U.S.C. § 983(d) (2000).

Because the new forfeiture procedures apply only to proceedings commenced on or after August 23, 2000, *see* § 21; *United States v. 221 Dana Ave.*, 261 F.3d 65, 67 n. 1 (1st Cir.2001), we review the instant appeal under the pre-Reform Act procedures.

ceedings, vesting will "relate[ ] back to the moment when the property became forfeitable"). Both statutes also exempted certain property [6] from forfeiture "to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. § 881(a)(6) (1994) (amended 2000). (The same provision, with minor wording differences, was also found in 18 U.S.C. § 981(a)(2) (1994) (amended 2000).) These provisions (and their current counterpart, 18 U.S.C. § 983(d) (2000)) constitute what is known as the "innocent owner defense."

■ As the forfeiture statutes then stood, the initial burden in judicial forfeiture proceedings was placed on the government to establish probable cause for forfeiture; once this burden was met, however, the ultimate burden of proof lay with the claimant. *See* 19 U.S.C. § 1615 (2000) (superseded with respect to civil forfeitures by 18 U.S.C. § 983(c)(2000)); [7] *United ed States v. Daccarett,* 6 F.3d 37, 55–57 (2d Cir.1993). Given the above-described statutes and their description of what property is forfeitable, then, it is clear that there are at least two distinct options open to a claimant to prevent forfeiture: (1) He or she may disprove that the property was involved in any illegal activity that would give rise to the forfeiture, or (2) even assuming that the property was so involved, the claimant may prove that, as owner of the property, he or she had no knowledge of its involvement in illegal activity—i.e., successfully assert the innocent owner defense. *See United States v. 4492*

*S. Livonia Rd.,* 889 F.2d 1258, 1267 (2d Cir.1989) ("The claimant must prove either that the property was not used unlawfully, or that the illegal use was without the claimant's knowledge or consent.") (citations omitted). It is only with regards to the second option that the issue of the claimant's ownership is of any relevance.

■ It must be remembered that what is adjudicated in a judicial civil forfeiture proceeding is the *government's* right to the property, not the claimant's. If the government can establish its right to forfeiture of the defendant property (or, as the statutes then provided, if the claimant fails to rebut the government's probable cause showing), the property is forfeited; if the government fails to do so, the property is not forfeited—regardless of whether or not the claimant turns out to be the actual owner of the property. Thus, the claimant's ownership of the defendant property is not at issue in determining the primary question of the government's right to forfeiture.

■ In the instant case, it is clear that the claimant never asserted an innocent owner defense. It is nowhere mentioned in his answer; moreover, the entire theory of his defense of the money orders was that they were his invested lottery winnings—clearly an attempt to disprove the government's theory that they were proceeds of criminal activity and a theory having no real bearing on an innocent owner defense. Therefore, the charging of the question of claimant's ownership to the jury was, in the procedural context of this case, error, although claimant has not ar-

---

**6.** Under 21 U.S.C. § 881(a), the innocent owner defense was (and is) not applicable to forfeitable property which is *itself* contraband—e.g., controlled substances. *See, e.g.,* 21 U.S.C. § 881(a)(8) (2000).

**7.** The forfeiture procedures under the customs laws were incorporated by reference in the civil forfeiture statutes. *See* 18 U.S.C. § 981(d) (2000); 21 U.S.C. § 881(d) (2000) (both partially superseded by 18 U.S.C. § 983(c)).

gued any prejudice from that error, and we see none.[8]

However, at oral argument the government asserted for the first time before this Court that the jury's negative answer to the ownership question deprived Mercado of standing to contest the forfeiture. *See Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir.1994) ("[A]n allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture."). We normally do not consider arguments raised only at oral argument, *see United States v. Barnes*, 158 F.3d 662, 672 (2d Cir.1998), and particularly not when, as here, the argument was likewise not made to the district court. Nonetheless, we briefly discuss the issue because standing issues potentially implicate this court's jurisdiction, any question as to which we are obliged to resolve regardless of the parties' arguments. *See Thompson v. County of Franklin*, 15 F.3d 245, 248–49 (2d Cir.1994).

The simple, if slightly question-begging, response to the government's contention is that because (as indicated above) the jury need never have been charged with the question of claimant's ownership of the defendant funds in the first place, its answer to that question—unless it had been adopted by the district court as its own finding, which it was not—is of no moment. Standing is, moreover, a legal question to be determined by the court, not a jury. *See United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir.1999). The larger question begged by our initial response, of course, is whether the issue of standing *should* be revisited, post-verdict, based either on the evidence presented at trial or on the facts found by the jury. We agree with the Fifth Circuit that such a practice would result in unnecessary and unproductive "tail-chasing." *See United States v. $9,041,598.68*, 163 F.3d 238, 245 (5th Cir.1998) ("Allowing a district court to revisit the question of standing post-verdict necessarily invites this Court to chase its tail—we ought review standing as a threshold matter yet in order to do so we must review the merits.").

We have previously described the determination of a claimant's standing as " 'the *threshold* question in every federal case, determining the power of the court to entertain the suit.' " *Cambio Exacto*, 166 F.3d at 526 (quoting *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 388 (2d Cir.1997)) (emphasis added). Standing is a question that determines whether the claimant may properly invoke the jurisdiction of the federal courts to determine the merits of the underlying dispute, and it therefore logically *precedes*, not follows, that determination. Consequently, to establish standing " 'the claimant need not prove the full merits of [his] underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court.' " *Torres*, 25 F.3d at 1158 (quoting *United States v. 116 Emerson St.*, 942 F.2d 74, 78 (1st Cir.1991)).

As the Fifth Circuit correctly notes, then, there is a logical difficulty in

---

**8.** We do not mean to imply that disputed issues of the claimant's ownership are *never* properly charged to the jury. In addition to cases where an innocent owner defense is asserted, it is possible, for example, that the jury may be properly asked to adjudicate cross-claims among multiple claimants, each with colorable but to some extent competing claims of interest in the defendant property (assuming, of course, the government fails to moot these claims by succeeding on its forfeiture claim).

determining standing based on the results of a trial, the propriety of which itself depends upon the determination of standing. Where, as is normally the case, it is the *plaintiff's* standing that is at issue, this logical difficulty is overcome by characterizing standing as part of the plaintiff's cause of action: "Since [elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ It must be remembered, however, that in a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated. If the government fails to meet its burden of proof (formerly probable cause, now preponderance), the claimant need not produce any evidence at all—i.e., the claimant has no "case" that he must present or "elements" to which he bears the

burden of proof. The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture.[9] Thus, the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required "facially colorable interest," *Torres*, 25 F.3d at 1158, not whether he ultimately proves the existence of that interest.[10] The district court correctly determined, prior to trial, that claimant had standing to contest the forfeiture, and the jury's finding regarding ownership did not affect that determination.

## II. The Motion to Suppress

As mentioned above, Mercado moved before the district court for the suppression of all evidence derived from the seizure of his briefcase containing the defendant money orders at LaGuardia. Specifically, Mercado urged the suppression of (1) Callery's testimony as to the denominations, dates and locations of purchase of the money orders; and (2) the evidence of the canine alert to the money orders for narcotics residue.

9. Indeed, because "the party invoking federal jurisdiction bears the burden of establishing" standing, *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, it might very well be argued that, at least as far as Article III—as opposed to statutory—standing goes, the claimant bears no burden at all, as it is really the government which is invoking the power of the federal courts to effect the forfeiture. That the government need pursue judicial forfeiture (instead of administrative forfeiture) only where a claimant comes forward does not change the fact that the government chooses whether or not to pursue judicial forfeiture, thus making the choice to bring suit in federal court entirely the government's, not the claimant's.

10. This is not to say, of course, that on appeal we may not review that threshold determination and indeed vacate the judgment below if

we find the district court erred in making that determination. Thus, for example, in this case the district court held that Article III standing was satisfied by the mere fact that "Mercado had custody of the money orders at the time of their seizure." *Mercado II*, 1998 WL 817651, at *2. We have held, however, that "where a mere custodian has possession, it is only a 'naked claim of possession' and does not thereby impart Article III standing" because such custodian "has not demonstrated injury sufficient to satisfy the Article III standing test." *Cambio Exacto*, 166 F.3d at 527. Thus, the district court's holding on this point is questionable. Nevertheless, because Mercado submitted a verified claim that he was the owner of the funds, we hold that he showed a sufficiently colorable interest to satisfy Article III standing requirements.

## A. Suppression in Civil Forfeiture Cases

The Supreme Court has held that the Fourth Amendment exclusionary rule applies in civil forfeiture cases. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 702, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). This circuit's exposition of that holding remains, however, somewhat unclear. In *United States v. $37,780 in U.S. Currency*, 920 F.2d 159 (2d Cir.1990), we stated that "an illegal seizure of property does not immunize that property from forfeiture, that *the property itself cannot be excluded from the forfeiture action*, and that evidence obtained independent of the illegal seizure may be used in the forfeiture action." *Id.* at 163 (emphasis added). The meaning of the italicized portion of this statement is somewhat unclear. Other courts of appeals and commentators have understood it to mean that the defendant property must also be admitted *for its evidentiary value* in forfeiture proceedings regardless of the propriety of its initial seizure—and, so interpreted, these courts and commentators have generally been critical of that principle. *See United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1064 & n. 27 (9th Cir.1994) (disagreeing with *$37,780* and noting that "majority" of circuits do likewise); 1 Wayne R. LaFave, *Search and Seizure* § 1.7(a) n. 10 (3d ed. 1996) ("Despite some authority to the contrary [i.e., *$37,-780* ], it does not follow that the res in a forfeiture proceeding, if itself illegally seized, can also be admitted for its evidentiary value.").

This circuit has not expounded further on the meaning of that statement, so its precise meaning—indeed, even its status as a holding—and its application to this case is unclear. Nor is it certain whether any of what claimant seeks to have excluded as fruits of an illegal seizure—such as

the information that Inspector Callery was able to ascertain from the money orders regarding purchase dates and places—might therefore be admissible under *$37,780* regardless of the propriety of the initial seizure because it is evidence obtainable from the face of the money orders themselves. However, because, as shown below, we find no Fourth Amendment violation upon which to base any type of exclusion of evidence, we need not further examine this rather murky area.

## B. The Airport Search(es) and Seizure(s)

We begin with some preliminary remarks delineating the scope of our inquiry. First, claimant does not contest the propriety of the initial opening of his briefcase by airport security personnel after they were unable to view the contents as it passed through the scanner. Nor does the claimant contend that, if the seizure of the briefcase of money orders at LaGuardia was proper, either the subsequent canine sniff by Brent or the examination by Inspector Callery constituted separate searches that required either additional probable cause or a warrant. Nor does claimant contend that, if none of the evidence admitted below is suppressed, the government did not have sufficient probable cause for forfeiture. Claimant's arguments, therefore, rise or fall on the constitutionality under the Fourth Amendment of (1) the detention of the briefcase by airport security pending the arrival of Detective Martin; (2) the look-through of the briefcase's contents by Detective Martin; and (3) the seizure of the money orders by Martin. We address each of these in turn.

Before undertaking that analysis, however, we note that the government seeks to avoid the entire inquiry by arguing that Mercado had no reasonable expectation of privacy in his briefcase, because

as an airline passenger he knew that he would have to expose the briefcase to scrutiny by security personnel. We have explicitly rejected this notion, *see United States v. Albarado*, 495 F.2d 799, 802–03 (2d Cir.1974) (search of carry-on luggage is "a search within the meaning of the Fourth Amendment"), and do so again today. The government's position would remove searches of briefcases carried by airline passengers from the ambit of the Fourth Amendment, and its protection against unreasonable searches and seizures, altogether. This position cannot be squared with the many cases examining the propriety of airport searches under the Fourth Amendment. *See, e.g., United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment."). Moreover, the mere fact that airline passengers know that they must subject their personal effects to reasonable security searches does not mean that they are automatically consenting to *un* reasonable ones. Otherwise, the government could eliminate Fourth Amendment protections altogether merely by announcing its intentions beforehand. *See Smith v. Maryland*, 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (noting that the subjective expectation inquiry would provide an "inadequate index of Fourth Amendment protection" where the government simply announces its intention to conduct unreasonable searches); *United States v. Taborda*, 635 F.2d 131, 137 (2d Cir.1980) (noting that a purely subjective test would permit "the government by edict or by known systematic practice to condition the expectations of the populace

in such a way that no one would have any real hope of privacy").

### 1. *The Detention of the Money Orders by Security Personnel*

As noted earlier, the claimant does not contend that the airport security personnel were not permitted to search his briefcase for weapons. What he does contend, however, is that once they found none, they were required to close up the briefcase and send Mercado on his way. In other words, because only a limited search for weapons or explosives was allowed, the security personnel were required to ignore anything else that they might have found. Otherwise, claimant contends, the airport administrative search will degenerate from its limited justifications into a general exploration for evidence of criminal activity. We disagree.

 It is well-settled that, under the "plain view" doctrine, law enforcement personnel may seize an item without a warrant provided that it is "immediately apparent that the object is connected with criminal activity," and further provided that the officers viewed the object from a lawful vantage point—i.e., that the officers "have not violated the Fourth Amendment in arriving at the place from where they can see" the object. *United States v. George*, 975 F.2d 72, 78 (2d Cir.1992); *see also Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).[11] The determination of lawful vantage point must focus on the activity which brought the object into plain view—here, the search of the briefcase by airport security personnel. As long as the scope of that initial search comported with the Fourth Amendment—i.e., was no more intrusive than necessary to accomplish its purpose of detecting weapons or explo-

---

**11.** *Horton* delineates a third requirement, not contested here, that the officer must have "a

lawful right of access to the object itself." *Horton*, 496 U.S. at 137, 110 S.Ct. 2301.

sives—then it is of no constitutional moment that the object found was not what was sought. As the district court correctly noted, "[t]hat lack of relationship *always* exists with regard to action validated under the 'plain view' doctrine." *Mercado I*, 1997 WL 1068678, at *2 (quoting *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)).

■ Claimant has made no plausible argument that the scope of the initial search of his bag for weapons, viewed *ex ante*, was impermissibly broad. He has offered no argument or evidence, for example, that the security personnel looked into areas or opened packages which could not possibly contain weapons or explosives. His argument, distilled to its essence, seems to be that the discovery of items other than weapons or explosives itself retroactively invalidates the initial search, because it indicates that the search exceeded its permissible scope. Such logic would eviscerate the plain view doctrine altogether. Moreover, in the case claimant cites in support of this contention, *United States v. $124,570 U.S. Currency*, 873 F.2d 1240 (9th Cir.1989), the court invalidated a seizure following an airport security search *not* because the search revealed evidence unrelated to the purpose of the search, but because evidence indicated that the security personnel had been given financial incentives to search more intensely than necessary for security reasons in the hope that they would find evidence of criminal wrongdoing (although

there was no evidence that the security personnel had *in fact* so increased search intensity). *See id.* at 1245–47.[12]

The remaining question with respect to the detention of the briefcase by security personnel pending Martin's arrival is whether the "incriminating character" of the money orders was "immediately apparent." *Horton*, 496 U.S. at 136, 110 S.Ct. 2301. Two inquiries are subsumed by this test: First, what information about the money orders was readily apparent to the security personnel during their search for weapons—that is, without subjecting the money orders to any more searching scrutiny than necessary for the weapons search? Second, did that information give rise to a sufficient probability that the money orders represented evidence of criminal activity to justify their detention?

On the first question, the district court initially found, in deciding the suppression motion, that the following characteristics of the money orders were "plain on [their] face" to the airport security personnel conducting the initial search: their "vast quantity," the fact that they were undesignated, the fact that they were unsigned, and the fact that they were issued in relatively small denominations. The district court did not, in its initial suppression ruling, adopt the finding of Magistrate Judge Gold that "the three-day time span within which the money orders were issued ... could readily be discerned on the face of the money orders in plain view of

---

**12.** Even that rationale, assuming there were any evidence to support such a theory here, has been rejected in this circuit. We have held that " 'the proper standard for judging the constitutionality of a search is a *totally objective one.*' " *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.1987) (quoting *United States v. Smith*, 643 F.2d 942, 944 (2d Cir.1981)); *see also Horton*, 496 U.S. at 138, 110 S.Ct. 2301 ("The fact that an officer is interested in an item of evidence and fully

expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement."). *But see City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating as a Fourth Amendment violation a regime of suspicionless stops where "the primary purpose ... is to uncover evidence of ordinary criminal wrongdoing").

the investigating officers." Report and Recommendation, slip op. at 5. However, following testimony by Detective Martin at the probable cause hearing that he knew at the time that the money orders were "bought on maybe two days, 90 percent of them, three days total," Prob. Cause Tr. 19, the district court made the further finding, in readdressing the Fourth Amendment issue, that "Martin knew at the time, as we know now, that [the money orders] were purchased over a period of only three days." Tr. 12.

■ It is true that "the validity of an arrest or search can be supported by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing," *United States v. Canieso*, 470 F.2d 1224, 1226 (2d Cir. 1972). We do not, however, rely on the district court's later finding regarding the dates of the money orders in our assessment of the propriety of the airport security personnel's detention under the plain view doctrine, primarily because the district court did not specifically find that the dates of the money orders were immediately apparent. Indeed, the district court noted that Martin determined the dates only after he "examined the money orders on the spot with sufficient care."[13] Tr. 8. Further, according to Inspector Callery, at least as to the postal money orders the date of purchase was indicated by one block of digits (in YYMMDD format) among several running along the top of the money order. Prob. Cause Tr. 52. This would make it rather doubtful that either the airport security personnel or

Detective Martin could have discerned the three-day purchase period of the money orders without such careful examination— an examination that almost certainly would have exceeded the permissible scope of a weapons/explosives check. We therefore do not consider the purchase dates of the money orders to have been a fact "immediately apparent" to the airport security personnel.

■ The aforementioned findings of the district court as to what characteristics of the money orders were immediately apparent were, at least at the time of the initial suppression motion, based largely on a declaration submitted by Agent Garifo, stating that "it was readily apparent to airport security personnel that the bag was filled with stacks of unsigned, undesignated money orders" which "ranged in denominations from $100 to $1,000." Garifo Decl. ¶ 6. Claimant asserts that it was error for the district court to refuse to hold an evidentiary hearing on this point, because his motion to suppress and supporting affidavit were " 'sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search [were] in question.' " *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir.1979)).[14]

■ Before the district court, claimant argued that an evidentiary hearing was necessary because there was a disputed issue as to whether it was readily apparent that the money orders were unsigned, un-

---

13. The implications of this "careful examination" on the permissibility of Martin's look-through of the briefcase are discussed *infra* Part II.B.2.

14. Both parties assume that the heightened procedural guarantees applicable to determination of a suppression motion in a criminal case likewise apply to a suppression motion in the civil forfeiture context. Because we hold claimant failed to meet his burden of production under even that heightened standard, we need not reach, and express no opinion upon, whether the parties are correct in their assumption.

designated, and in small denominations. Specifically, claimant relied on (1) the assertion that Agent Garifo's declaration was hearsay and (2) the assertion that the characteristics in question could have been determined only by closely inspecting *each* of the 981 money orders, thereby exceeding the permissible scope of the initial search. As to the first issue, it is well-settled that hearsay may properly be considered by a court in determining a suppression motion.[15] *See United States v. Matlock,* 415 U.S. 164, 172–73, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Marchand,* 564 F.2d 983, 992 n. 18 (2d Cir.1977); Fed.R.Evid. 104(a), 1101(d)(1). The second argument was patently without merit, as the district court never purported to find it immediately apparent that *each* of the 981 money orders had the aforementioned characteristics, nor quite obviously would such a showing have been necessary. Moreover, the second argument highlights quite nicely the failure of claimant to meet his burden of production under *Pena:* he submitted no evidence (nor even argued) either that the airport security personnel had *actually* inspected each of the 981 money orders (thus invalidating the initial search) or, alternatively, that under the scope of the search actually undertaken, the money orders' key characteristics did not come into plain view. Claimant failed to produce any such evidence despite the fact that he was a witness to the search and could have competently testified to either fact.

On appeal, claimant's argument is slightly different. Rather than assert a dispute as to the immediately apparent nature of the incriminating characteristics of the money orders, claimant now asserts that there was a dispute as to whether the airport security personnel actually "noticed" these characteristics. Having failed clearly to present this argument to the district court, the claimant may not now be heard to complain about the court's failure to hold an evidentiary hearing on the point. *See Pena,* 961 F.2d at 339 (evidentiary hearing required if *"the moving papers ... enable the court to conclude that contested issues of fact going to the validity of the search are in question"*) (emphasis added); *cf. DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 822 (2d Cir. 1997) (expressing the general principle that we will "confin[e] our review on appeal to the issue as framed by [the parties] in the district court").

■ In any event, we find claimant's new contention to be without merit. If by "noticed" the claimant means to draw a distinction between the incriminating characteristics having been "immediately apparent" to the airport security personnel during their search and these characteristics having been *actually perceived* by those conducting the search, we decline to make such a distinction. At least in the absence of evidence that the officer conducting the search was under some disability or that his normal powers of perception were blocked by some obstruction or hindrance, it seems fairly clear that if a characteristic is "immediately apparent" to those conducting a search, then it necessarily follows that they "noticed" that characteristic. If, instead, by "noticed" the claimant means whether the airport security personnel considered the relevant characteristics of the money orders to be incriminating—i.e., whether they subjectively considered those characteristics to be legally relevant—we reject the argument. Determination of probable cause (or reasonable suspicion) is an objective assessment—namely, "would the facts

---

**15.** Claimant also made an argument, now abandoned on appeal, that the use of Garifo's declaration violated the Confrontation Clause of the Sixth Amendment.

available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate," *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925))—so that a search or seizure may be upheld if the facts known to the officer support the requisite level of suspicion even if the officer does not subjectively believe them so to do. *See Florida v. Royer,* 460 U.S. 491, 507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (fact that officers proceeded on the belief that they had only reasonable suspicion did not preclude a later finding that they had probable cause); *cf. United States v. Jackson,* 652 F.2d 244, 250 (2d Cir.1981) (officer's subjective belief that a "stop" had become an "arrest," thus requiring probable cause, was irrelevant; objective facts indicated that no arrest had yet occurred). Thus, the fact that there was no evidence as to the subjective understanding, on the part of the airport security personnel, of the legal significance of the money orders does not affect this court's ability to determine the propriety of the money orders' detention by those personnel pending the arrival of Detective Martin.

We now turn to whether the immediately apparent characteristics of the money orders—their volume, along with the fact that they were unsigned, undesignated, and in relatively small denominations— were of a sufficiently incriminating nature to validate their detention pending Detective Martin's arrival. The district court held that these facts gave the *police* probable cause to believe the money orders were evidence of a structuring violation, a conclusion which we address (and in which we ultimately concur) below, but did not discuss whether the airport security personnel likewise had probable cause. No doubt this was due to the fact, mentioned earlier, that the district court did not treat the detention pending Detective Martin's arrival as a separate detention requiring justification.

■ As pointed out above, the determination of probable cause is an objective one, to be made without regard to the individual officer's subjective motives or belief as to the existence of probable cause. An officer's experience and training, however, are to be taken into account such that, as the leading treatise on search and seizure law puts it, "a trained and experienced officer will have probable cause in circumstances when the layman would not." 2 LaFave, *Search and Seizure* § 3.2(c); *see United States v. Price,* 599 F.2d 494, 501 (2d Cir.1979) (circumstances surrounding a stop " 'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training' ") (quoting *United States v. Oates,* 560 F.2d 45, 61 (2d Cir.1977)). We recently demonstrated the effect of this principle in *United States v. Colon,* 250 F.3d 130 (2d Cir. 2001), in which we held that facts which would have undisputedly given rise to reasonable suspicion sufficient to support a stop-and-frisk had they been known by an *officer, see id.* at 134, nevertheless failed to rise to that level when known only to a civilian 911 operator with no demonstrated training in criminal law or procedure, *see id.* at 137. There was no evidence below of any particular training on the part of airport security personnel, nor are we inclined to presume that they had any specialized training or knowledge—at least not with respect to anything beyond the weapons screen they were hired to perform and certainly not with respect to the intricacies of structuring or narcotics violations. We are skeptical, therefore, of any claim that the airport security personnel

had probable cause to detain claimant's briefcase.

■ We need not decide this question, however, because we hold that probable cause was not required. It is true that in *Hicks,* the Supreme Court held that probable cause was generally required to validate a seizure under the plain view doctrine. 480 U.S. at 326–27, 107 S.Ct. 1149. That opinion also cautioned, however, that the Court was *not* saying that "a seizure can never be justified on less than probable cause," *id.* at 327, 107 S.Ct. 1149, and specifically referred to the Court's earlier decision in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), as describing one situation in which probable cause was not required. *Place* provides the appropriate guidance here.

In *Place,* the Supreme Court took the principle underlying *Terry v. Ohio*—that a brief, investigatory detention of a *person* could be justified without probable cause—and applied that principle to detentions of personal effects. *See Place,* 462 U.S. at 702, 103 S.Ct. 2637. Specifically, the Court held that

> when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

*Id.* at 706, 103 S.Ct. 2637; *see also United States v. Hooper,* 935 F.2d 484, 492–98 (2d Cir.1991) (upholding a brief detention of an airport traveler's luggage on reasonable suspicion that the luggage contained narcotics pending an investigation to establish

probable cause). The Court also noted that "if this investigative procedure is itself a search requiring probable cause, the initial seizure of [the] luggage for the purpose of subjecting it to [that investigative procedure]—no matter how brief—could not be justified on less than probable cause." *Place,* 462 U.S. at 706, 103 S.Ct. 2637. (We address this point below in discussing Martin's look-through of the briefcase.)

In *Place* the defendant's luggage had been taken to an undisclosed location and subjected to a dog sniff some ninety minutes later. The Court found it "clear that the police conduct here exceeded the permissible limits of a *Terry*-type investigative stop." *Id.* at 709, 103 S.Ct. 2637. The Court relied on (1) the length of the detention, (2) the lack of diligence of the police in pursuing their investigation, and (3) the failure accurately to inform the defendant of where they were taking his luggage, how long it might be, and what arrangements would be made for returning the luggage should the officers' suspicion fail to hold up. *See id.* at 709–10, 103 S.Ct. 2637.

These factors make it similarly clear that the detention of claimant's briefcase in this case could be justified by reasonable suspicion alone. The district court found, based on Detective Martin's testimony, that it took the detective only two minutes to respond to investigate the briefcase, demonstrating both diligence and the minimal nature of the detention. Tr. 7.[16] The briefcase remained, along with the claimant, at the baggage screening point the entire time. In short, so long as the airport security personnel had reasonable suspicion arising from the facts known to them, the brief detention of

---

16. Mercado's testimony that it took approximately twenty, not two, minutes for Detective Martin to arrive, even if credited, would not alter our conclusion. We have upheld *Terry*-type detentions of longer periods. *See Hooper,* 935 F.2d at 495–98.

claimant's luggage was proper in order to allow trained police officers to "quickly confirm or dispel [that] suspicion." *Place*, 462 U.S. at 702, 103 S.Ct. 2637.

Finally, we have no difficulty finding that, even treating the airport security personnel as laymen, they had such reasonable suspicion. Even to the layman, untrained in the ways of narcotics traffickers and the details of currency transaction reporting requirements, the presence at the airport of a person carrying a briefcase full of blank money orders of small (at least relative to the total value of the money orders) denominations would give rise to a well-founded suspicion that some kind of "criminal activity [was] afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Detaining the briefcase briefly so that trained law enforcement personnel could investigate further was completely proper, especially when one considers that failing to have done so would likely have resulted in claimant and his money orders disappearing altogether. Under the circumstances, we find the detention of the briefcase by airport security to be well within the bounds of reasonableness as commanded by the Fourth Amendment.

### 2. The "Search" by Detective Martin

▆▆▆ We next examine whether Detective Martin's perusal of the money orders likewise comported with the Fourth Amendment.[17] Claimant's sole argument on this point is that the briefcase was closed after the airport security personnel looked through it and that Martin's opening of the briefcase constituted a new "search" for Fourth Amendment purposes. We agree with the district court that the closing of the briefcase is irrelevant to the Fourth Amendment inquiry. As long as Detective Martin's search of the briefcase was of no greater scope or intensity than the airport security personnel's, then "no additional invasion of [claimant's] privacy interest" occurred and there was no additional "search" for purposes of the Fourth Amendment. *See Hicks*, 480 U.S. at 325, 107 S.Ct. 1149; *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (holding that it was no "search" for government to reexamine contents of package already legitimately opened and partially repackaged because "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated."); *see also United States v. Knoll*, 16 F.3d 1313, 1320 (2d Cir.1994) (reasonable expectation of privacy in closed files existed only insofar as they had not already been legitimately searched); *United States v. Menon*, 24 F.3d 550, 563 (3d Cir.1994) (where one officer legitimately saw characteristics of an object during a search, a second officer was entitled to look at the object "to the same extent" as the first without negating plain-view applicability).

▆▆ Moreover, even if Detective Martin's search had been more intrusive than the initial search by airport security personnel, only the information attributable to that *additional* "search" would require

---

**17.** The government has argued that any search by Detective Martin was conducted pursuant to consent given by the claimant, either directly to Martin or by failure to delimit the consent allegedly given earlier by claimant to airport security. It is the government's burden to establish that consent was freely given and that the claimant had not "merely acquiesced in a show of authority."

*United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir.1980). The district court made no explicit findings in this regard, and in any case we see sparse evidence in the record by which to find that the government carried its burden on this point. We therefore do not rely on any consent rationale to uphold the search and seizure of claimant's briefcase.

suppression.[18] As noted above, the airport security personnel legitimately viewed the money orders' volume, their undesignated/unsigned nature, and their small denominations. Detective Martin's viewing of the money orders to that same extent did not constitute an additional "search" under the Fourth Amendment.

### 3. *The Seizure By Detective Martin*

Finally, we turn to the seizure by Detective Martin at the airport. We first note that, unlike the seizure by the airport security personnel, the seizure by Detective Martin cannot be justified as a brief investigatory detention supportable by less than probable cause. This is because, if probable cause did not exist at the time Martin seized the briefcase at LaGuardia, no new information supporting probable cause became available until the positive alert by Brent *the next day,* and the detention in the interim could not possibly be justified on a *Terry*-type rationale. *See Place,* 462 U.S. at 709, 103 S.Ct. 2637 (ninety-minute length of detention "alone precludes" finding of reasonableness). Thus, we must examine whether the facts as known to Detective Martin at the airport constitute probable cause. We hold that they do.

 Claimant asserts that probable cause did not exist until the canine alert, relying on the proposition that a large sum of money is not by itself sufficient to establish probable cause. Were the funds here currency and the only possible violation one of narcotics or narcotics-related money laundering, we might very well agree. *See United States v. $121,100.00 in United States Currency,* 999 F.2d 1503, 1506 (11th Cir.1993) ("Absent some evidence connecting specifically to illegal drugs even a large sum of money, there is no reasonable basis for believing that the money is substantially linked to an illegal exchange of a controlled substance. As such, currency by itself is insufficient to establish probable cause.") (citation omitted). Like the district court, we find that at the time of the seizure there was probable cause with regard to a structuring violation. Relative to that violation, the fact that these were money orders, not currency, distinguishes this case from the ones cited by claimant.

Currency—that is to say, cash—is of course accrued by all types of legitimate businesses, often in small denominations, and though for a business to choose to keep (and transport) over half a million dollars of its proceeds in cash form would be, to say the least, foolhardy, it would not necessarily be indicative of criminality—foolishness not yet being a crime. The reason that transporting so much money as cash might be deemed folly, of course, is lack of security—cash being fully utilizable by anyone into whose possession it comes. That lack of security is why wiser persons might choose to convert their cash into more secure instruments which cannot be utilized by others if they become lost or stolen.

Money orders can be one of these more secure instruments, but as the district court correctly concluded, if one has half a million dollars worth of cash to convert into more secure monetary instruments, one could much more easily have obtained, say, a cashier's check for the entire amount—"if the one who obtains them is

---

**18.** Thus, the district court's description of Detective Martin having discerned the dates of the money orders after "careful examination," would likely constitute evidence of an additional search in that it exceeded the actual and permissible scope of the initial search by airport security personnel. However, as we discuss below, even without the date information we hold that there was probable cause to seize the money orders; therefore, this "careful examination" was permissible.

not concerned about these reporting requirements or recordkeeping requirements." Tr. 13. Preferring to use money orders of such small denomination is not only more time-consuming but more expensive, in that there is some charge for each money order. For these reasons, therefore, money orders are quite different from cash, and we agree with the district court that the facts legitimately available to Detective Martin—a large sum of money orders, undesignated, unsigned, and in small denominations—gave rise to probable cause that the money orders were obtained for the purpose of evading currency transaction reporting requirements and were thus evidence of a structuring violation. This probable cause, in turn, gave Detective Martin the authority to seize the money orders pursuant to the plain view doctrine. There being no Fourth Amendment violation, the district court properly denied claimant's motion to suppress.

### 4. *Probable Cause for Forfeiture*

As indicated initially, claimant makes no serious challenge to the presence of probable cause for forfeiture if we reject, as we have, his Fourth Amendment claims. For the sake of completeness, however, we affirm the district court's findings that the government met its burden to establish probable cause for forfeiture on all three of its theories—structuring, narcotics proceeds, and money laundering. For purposes of establishing probable cause for forfeiture, the government may rely upon any evidence it has lawfully obtained up to the time of the forfeiture trial. *See 4492 S. Livonia Rd.*, 889 F.2d at 1268. Thus, in addition to the facts discussed in the Fourth Amendment probable cause determination, the government was entitled to rely upon (1) the fact that the money orders were purchased over an approximately three-day period; (2) the fact that they were purchased from some forty-nine locations; (3) the positive narcotics alert by Brent; (4) the affidavit by Agent Mazza regarding his undercover conversations in 1993 with claimant in which claimant asserted his control of large amounts of narcotics; and (5) claimant's 1999 narcotics conviction.

As to the structuring violation, the probable cause we have already held existed based on the facts known at the time of seizure is of course only enhanced by the additional facts of the dates and locations of purchase, which not only indicated the extraordinary effort which went into purchasing the money orders in such small denominations but also eliminated any possibility that the money orders had been received in those denominations in the ordinary course of business. As for the narcotics trafficking and money-laundering allegations, the required "nexus between the seized property and illegal drug activity," *Daccarett*, 6 F.3d at 56, was sufficiently established by, *inter alia*, the fact that Brent alerted positively to the money orders for narcotics residue even though they had been issued at most three to four days prior (and, unlike currency, could not have picked up that residue from general circulation). In sum, the government met its burden of establishing probable cause for forfeiture.

### III. *The Delay Between Seizure and Institution of the Forfeiture Proceedings*

Finally, the claimant argues that the approximately fifteen months which elapsed between the seizure of the money orders at LaGuardia and the government's institution of judicial forfeiture proceedings constitutes an unreasonable delay that bars the forfeiture of the defendant funds. The government responded that this issue was forfeited by the claimant's failure suf-

ficiently to press the claim before the district court, and there is some merit in the government's contention. While it is true that the claimant noted in its answer to the forfeiture complaint an affirmative defense of "unreasonable delay," and noted the claimed unreasonable delay to the district court at the conclusion of the probable cause hearing, we find no point in the record where the claimant specifically requested dismissal of the action on that ground, as is normally required to preserve an issue for review. *See* Fed. R.Civ.P. 46. Claimant's reference to the issue at the probable cause determination was an odd and confusing choice. As we understand his argument, the unreasonableness of the delay did not render the government without probable cause for institution of the forfeiture proceedings, but rather barred forfeiture altogether, even in the face of an unrebutted showing of probable cause. A motion to dismiss would have been far clearer. Nonetheless, we believe the claimant sufficiently apprised the district court (and the government) of its objection so that the better course on appeal is to review the issue on its merits rather than considering it forfeited.

Claimant argues that the delay between seizure and filing of the forfeiture complaint violated the then-existent statutory requirement that, where warrantless seizures of property have occurred, forfeiture proceedings be instituted "promptly." 21 U.S.C. § 881(b) (1994) (amended 2000).[19] Failure to comply with these requirements, asserts the claimant, bars forfeiture of the property altogether.

To begin with, § 881(b) required that, where property had been seized without a warrant on the ground that "the Attorney General has probable cause to believe the property is subject to civil forfeiture," as was the case here, "proceedings under subsection (d) of this section shall be instituted promptly." § 881(b). Subsection (d), however, refers not solely to the institution of judicial forfeiture proceedings, but instead to, *inter alia*, "[t]he provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws," i.e., the provisions of 19 U.S.C. §§ 1602–1621. *See* 21 U.S.C. § 881(d). As noted above, these provisions allow, in certain instances (including, as here, seizure of monetary instruments), for administrative forfeiture proceedings to be commenced by publication and notice to interested parties, to be followed by judicial proceedings only upon the filing of a proper claim (and posting of a bond). Thus, as far as § 881(b)'s requirement of "prompt" institution of proceedings under § 881(d) is concerned, the plain language of the statute would seem to indicate that the act constituting institution of proceedings would be the institution of *administrative* forfeiture proceedings (in those instances where administrative forfeiture was permissible). The DEA sent notice to the claimant, thereby instituting administrative forfeiture proceedings, on July 11, 1994, a little over one month after the seizure. Obviously, there can be no question as to the promptness of this action.

Even if the promptness requirement were taken to apply to the institution of

---

**19.** As amended by § 5(b) of the Civil Asset Forfeiture Reform Act, seizures under 21 U.S.C. § 881 are now governed by the procedures outlined in 18 U.S.C. § 981(b). These procedures, as amended by § 5(a) of the aforementioned Act, more narrowly restrict the situations in which warrantless seizures may be effected, but the statutory requirement of "prompt" institution of forfeiture proceedings has been eliminated. *See* 18 U.S.C. § 981(b) (2000).

*judicial* proceedings, the claimant points us to no authority for the proposition that the proper remedy for a violation of this requirement is the immunization from forfeiture of property to which the government would otherwise be entitled. Indeed, in our opinion such a remedy is foreclosed by the reasoning of *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), in which the Supreme Court held that, where Congress had included various "promptness" requirements in the statutory forfeiture provisions of 19 U.S.C. §§ 1602–1604 but included no statutory penalty for failure to meet those requirements, the Court would not impose its own sanction of dismissal. *Id.* at 64–65, 114 S.Ct. 492; *see also id.* at 63, 114 S.Ct. 492 ("[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."). Congress having specified no sanction for the failure to file "promptly" as (then) required by 21 U.S.C. § 881(b), we decline the invitation to do so ourselves.[20] Regardless, therefore, of whether the delay in instituting proceedings violated any statutory promptness requirements (and we do not mean to imply that it did), claimant has not demonstrated that immunization of the property would be a proper remedy.

## CONCLUSION

In sum, we find that the district court properly refused to suppress evidence from the forfeiture proceedings, as there was no Fourth Amendment violation in the seizure of the defendant funds. With no basis for suppression, the evidence presented amply demonstrated probable cause for forfeiture and supports the jury's verdict. Finally, there is no basis for overturning the judgment of forfeiture based on the delay between seizure of the funds and the institution of the civil forfeiture proceedings. We therefore affirm the judgment of the district court.

---

**20.** Claimant has not argued before this court that the delay between seizure and forfeiture was a deprivation of property without due process under the Fifth Amendment, and even if the quote in his brief from *United States v. Daccarett*, 6 F.3d at 57 ("We therefore stress the need for courts to ensure that what little due process is provided for in the statutory scheme is preserved in practice.") could be read to indicate a *constitutional* due process argument, claimant has offered no argument as to why any of the four factors laid out in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564–65, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), weigh in his favor. We therefore do not address the issue.