24-185(L)
*In re: Enforcement of Philippine Forfeiture Judgment*

In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2024

ARGUED: MARCH 11, 2025
DECIDED: AUGUST 18, 2025

Nos. 24-185(L), 24-186(Con)

IN RE: ENFORCEMENT OF PHILIPPINE FORFEITURE JUDGMENT AGAINST
ALL ASSETS OF ARELMA, S.A., FORMERLY HELD AT MERRILL LYNCH,
PIERCE, FENNER & SMITH, INCORPORATED, INCLUDING, BUT NOT
LIMITED TO, ACCOUNT NUMBER 16[*]

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, WESLEY, and BIANCO, *Circuit Judges*.

————

Ferdinand E. Marcos was a dictator and kleptocrat who ruled the Republic of the Philippines as its President from 1965 to 1986. Marcos stole billions of dollars from the Republic and its people and used networks of foreign financial accounts and shell corporations to hide stolen funds. These assets have been subject to competing legal

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

claims by Marcos's victims, including the Republic itself, since the end of his presidency.

This case concerns a New York bank account at Merrill Lynch into which Marcos deposited roughly $2 million in 1972 that, over fifty years, has grown to over $40 million. After an interpleader action failed to determine the rightful owner, the Republic asked the United States Attorney General to commence federal proceedings on its behalf under 28 U.S.C. § 2467 to enforce a forfeiture judgment that a Philippine court had awarded to the Republic pertaining to the account. The Attorney General obliged by initiating the case now before us.

Two of Marcos's judgment creditors intervened: (1) a class of nearly 10,000 victims of Marcos's human rights abuses; and (2) Jeana Roxas, as personal representative of the estate of Roger Roxas, from whom Marcos had stolen treasure that had been left in the Philippines by Japanese forces during World War II. Each asserted affirmative defenses to the Attorney General's enforcement proceeding. On summary judgment, the United States District Court for the Southern District of New York (Kaplan, *J.*) rejected the class's defenses, dismissed Roxas from the proceeding for lack of Article III standing, and entered judgment for the Government, thereby enabling the return of the assets to the Republic. It also denied Roxas leave to amend her answer to add additional affirmative defenses. The class and Roxas appealed.

We conclude that the class failed to create a genuine dispute of material fact as to its affirmative defenses. We also hold that Roxas lacked standing to participate as a respondent because she failed to create a genuine dispute as to her interest in the assets. We therefore AFFIRM the district court's judgment in favor of the Government.

2

————

CLAY ROBBINS III, Wisner Baum LLP, Los Angeles, CA (W. Crawford Appleby, Wisner Baum LLP, Los Angeles, CA; Daniel J. Brown, Brown Law Group, PLLC, New York, NY, *on the brief*), *for Respondent-Appellant Jeana Roxas, as Personal Representative of the Estate of Roger Roxas,* and *Intervenor-Appellant Golden Budha Corporation.*

JOSHUA L. SOHN (Barbara Y. Levy, *on the brief*), United States Department of Justice, Washington, D.C., *for Interested Party-Appellee United States of America.*

ROBERT A. SWIFT, Kohn, Swift & Graf, P.C., Philadelphia, PA (Jeffrey E. Glen, Anderson Kill P.C., New York, NY, *on the brief*), *for Intervenor-Appellant Jose Duran, on his behalf and as representative of a Class of Judgment Creditors of the Estate of Ferdinand E. Marcos.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Ferdinand E. Marcos was a dictator and kleptocrat who ruled the Republic of the Philippines as its President from 1965 to 1986. Marcos stole billions of dollars from the Republic and its people and used networks of foreign financial accounts and shell corporations to hide stolen funds. These assets have been subject to competing legal claims by Marcos's victims, including the Republic itself, since the end of his presidency.

This case concerns a New York bank account at Merrill Lynch into which Marcos deposited roughly $2 million in 1972 that, over fifty years, has grown to over $40 million. After an interpleader action

3

failed to determine the rightful owner, the Republic asked the United States Attorney General to commence federal proceedings on its behalf under 28 U.S.C. § 2467 to enforce a forfeiture judgment that a Philippine court had awarded to the Republic pertaining to the account. The Attorney General obliged by initiating the case now before us.

Two of Marcos's judgment creditors intervened: (1) a class of nearly 10,000 victims of Marcos's human rights abuses; and (2) Jeana Roxas, as personal representative of the estate of Roger Roxas, from whom Marcos had stolen treasure that had been left in the Philippines by Japanese forces during World War II. Each asserted affirmative defenses to the Attorney General's enforcement proceeding. On summary judgment, the United States District Court for the Southern District of New York (Kaplan, *J.*) rejected the class's defenses, dismissed Roxas from the proceeding for lack of Article III standing, and entered judgment for the Government, thereby enabling the return of the assets to the Republic. It also denied Roxas leave to amend her answer to add additional affirmative defenses. The class and Roxas appealed.

We conclude that the class failed to create a genuine dispute of material fact as to its affirmative defenses. We also hold that Roxas lacked standing to participate as a respondent because she failed to create a genuine dispute as to her interest in the assets. We therefore AFFIRM the district court's judgment in favor of the Government.

## BACKGROUND

This appeal is the latest chapter in a decades-long battle over certain assets of Ferdinand E. Marcos in a New York bank account. Marcos was President of the Republic of the Philippines (the

4

"Republic") from 1965 until 1986. During his presidency, Marcos stole billions of dollars from the Republic and its citizens for his personal gain (committing human rights violations along the way). Much of Marcos's theft occurred after he declared martial law in 1972. Litigation over Marcos's stolen assets has percolated through American courts since 1986, when he left power and fled to Hawaii before his death in 1989. *See, e.g.*, *N.Y. Land Co. v. Republic of Philippines*, 634 F. Supp. 279 (S.D.N.Y. 1986).

In this particular case, the United States, acting on the Republic's behalf, seeks enforcement of a judgment issued by a Philippine court that ordered the New York account forfeited to the Republic. Respondents-Appellants are other victims of Marcos and their successors in interest who hold money judgments against Marcos's estate. They entered the action to block the Government from enforcing the Philippine judgment.

## I.  The Arelma Assets

The New York bank account was opened in 1972, after Marcos and co-conspirator Jose Campos incorporated Arelma S.A. under Panamanian law to hold $2 million at Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") in New York. Arelma S.A. deposited $2 million into the account in November 1972, worth over $40 million today (the "Arelma Assets" or the "Assets"). In 2017, the Assets were transferred to the custody of the New York State Comptroller, where they remain today. The parties agree that Arelma S.A. was an alter ego of Marcos and that all of the Assets are proceeds of his criminal activity.

5

## II.    The Class

Intervenor-Appellant Jose Duran proceeds on behalf of himself and as representative of a class of 9,539 Filipino human rights victims and their successors in interest (the "Class").  Members of the Class or their families suffered abuse at the hands of the Marcos regime, including torture and summary execution.  *See generally Hilao v. Est. of Marcos*, 103 F.3d 767 (9th Cir. 1996).  After suing the Marcos estate in 1986 in the United States District Court for the District of Hawaii, the Class won a judgment of approximately $2 billion.  *Id.* at 772.  Because the estate's assets were dissipated in violation of court orders, the Class could not collect on the judgment.  *See generally In re Est. of Marcos Hum. Rts. Litig.*, 496 F. App'x 759 (9th Cir. 2012).

## III.    Roxas and the Golden Budha Corporation

Intervenor-Appellant Jeana Roxas proceeds on behalf of the estate of Roger Roxas, a treasure hunter and Marcos's judgment creditor.[1]  Golden Budha Corporation ("GBC") is a company affiliated with Roxas and the two share counsel in this case.

Starting in 1970, Roger Roxas spent seven months digging near the Baguio General Hospital in the Northern Philippines.  After uncovering a network of tunnels, he discovered a treasure trove that he believed to have been left behind by Japanese General Tomoyuki Yamashita during Japan's retreat from the Philippines in World War II (the "Yamashita Treasure").  *Roxas v. Marcos*, 89 Haw. 91, 101

---

[1] We refer to both Roger Roxas, who is deceased, and Jeana Roxas, who proceeds on behalf of his estate, as "Roxas."

(1998).[2]  Roxas took a large golden Buddha statue; uncut diamonds; samurai swords; and twenty-four gold bars, seven of which he sold. *Id.* at 101-02.  On April 5, 1971, Marcos's police raided Roxas's home and stole the Buddha, diamonds, swords, and remaining seventeen gold bars.  *Id.* at 102.  In 1996, Roxas's estate won a multi-million-dollar judgment in Hawaii state court based on claims that Marcos had tortured him and stolen the treasure (the "Hawaii Tort Action"). *Id.* at 103-04, 113-14.

## IV.  Previous Lawsuits Relevant to this Action

Several prior suits involving the Republic, Appellants, and the Arelma Assets are relevant to resolving the appeal before us.

### A. Federal Lawsuits Brought by the Republic in the 1980s

In the 1980s, the Republic filed three suits against Marcos in district courts in New York, Hawaii, and Texas that accused him of misappropriating the Republic's funds and hiding them in American accounts.  *See Republic of Philippines v. Marcos*, No. 86-cv-2294 (S.D.N.Y. 1986); *Republic of Philippines v. Marcos*, No. 86-cv-3859 (C.D. Cal. 1986); *Republic of Philippines v. Marcos*, No. 86-cv-1184 (S.D. Tex. 1986).  The Republic voluntarily dismissed each action as to Marcos.

### B. The Interpleader Action

After receiving competing demands for the Arelma Assets from Marcos's creditors, Merrill Lynch filed an interpleader action in the Hawaii district court in 2000 to determine the Assets' ownership (the "Interpleader Action").  The Class, Roxas, and the Republic were

---

[2] Both the Government and Roxas rely on the facts affirmed by the Hawaii Supreme Court in *Roxas v. Marcos*, 89 Haw. 91 (1998).  Gov. Br. 7 n.5; Roxas Br. 26 n.6.

named as parties, but the Republic asserted sovereign immunity and was dismissed from the action. The Assets were awarded to the Class in 2004. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 860 (2008). The Supreme Court vacated the award in 2008, holding that the Assets could not be distributed without the Republic's participation due to its sovereign immunity and its status as an indispensable party. *Id.* at 865-66, 872.

### C. The Philippine Judgment

In 1991, the Republic brought forfeiture proceedings in a Philippine anti-corruption court, the Sandiganbayan, seeking assets stolen by the Marcos regime. The Republic moved for summary judgment with respect to the Arelma Assets in 2004. On April 2, 2009, the Sandiganbayan granted the motion, entering forfeiture in the Republic's favor (the "Philippine Judgment"). The court found that the Assets were based on around $2 million of criminally obtained property that Campos had deposited at Merrill Lynch in 1972. The Philippine Supreme Court affirmed in 2012 and subsequently denied reconsideration.

## V. The Present Action

In January 2015, the Republic formally requested that the U.S. Attorney General enforce the Philippine Judgment against the Arelma Assets. On February 11, 2016, the Assistant Attorney General for the Criminal Division of the U.S. Department of Justice certified that the Republic's request was in the interest of justice. On June 27, 2016, the Government brought this action by filing an enforcement application under 28 U.S.C. § 2467 in the United States District Court for the District of Columbia. The action was later transferred to the Southern District of New York.

8

Roxas and the Class intervened and, in their answers, asserted affirmative defenses to enforcement. GBC, represented by the same counsel as Roxas, unsuccessfully sought to intervene. Dist. Ct. Dkt. No. 96.

Appellants now seek review of three of the district court's orders, described below, that collectively extinguished their affirmative defenses and dismissed Roxas's defenses to the enforcement proceeding for lack of standing, resulting in a judgment in the Government's favor. GBC also challenges the denial of its motion to intervene.

First, in September and October 2019, the Class and the Government cross-moved for summary judgment on the Class's statute of limitations defense. On February 27, 2020, the district court, affirming the recommendation of a magistrate judge (Gorenstein, *M.J.*), held that the Government's suit was timely. *In re Enf't of Philippine Forfeiture Judgment* (*Arelma I*), 442 F. Supp. 3d 756 (S.D.N.Y. 2020).

Second, on February 7, 2023, the district court denied Roxas's motion for leave to amend her answer to add additional affirmative defenses, rejecting the magistrate judge's recommendation. *In re Arelma, S.A.* (*Arelma II*), No. 19-mc-412, 2023 WL 1796615 (S.D.N.Y. Feb. 7, 2023).

Finally, in September 2022, the Government moved for summary judgment against Roxas and the Class on their remaining defenses and separately sought summary judgment against Roxas for her lack of Article III standing. The Class cross-moved for summary judgment in its favor on its affirmative defenses, requesting dismissal of the case. On January 11, 2024, the district court adopted the

9

magistrate judge's recommendation to reject the Class's remaining defenses, dismiss Roxas's challenge to the enforcement proceeding for lack of standing, and deny the Class's cross-motion for summary judgment. *In re Arelma, S.A.* (*Arelma III*), No. 19-mc-412, 2023 WL 6449240 (S.D.N.Y. Oct. 3, 2023), *report and recommendation adopted sub nom. In re Enf't of Philippine Forfeiture Judgment Against All Assets of Arelma, S.A.*, No. 19-mc-412, 2024 WL 127023 (S.D.N.Y. Jan. 11, 2024).

## DISCUSSION

On appeal, the Class argues that it created a genuine dispute of material fact as to its affirmative defenses and thus the district court erred in granting summary judgment to the Government. In the alternative, the Class asserts that enforcement of the Philippine Judgment should be limited as to the amount of assets and the custodian to which it pertains. Roxas, meanwhile, challenges the district court's grant of summary judgment based on her lack of Article III standing. She also reasserts her affirmative defenses that were mooted by the district court's standing decision and argues that it wrongly denied her leave to amend her answer to add additional defenses.

"We review de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (per curiam).[3] Decisions as to Article III standing are also reviewed de novo. *United States v. Cambio Exacto,*

---

[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, and citations are omitted.

*S.A.*, 166 F.3d 522, 526 (2d Cir. 1999). We review for abuse of discretion a district court's denial of leave to amend, *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000), denial of intervention, *United States v. City of New York*, 198 F.3d 360, 364 (2d Cir. 1999), and rulings as to which materials are admissible for consideration on summary judgment, reversing only decisions that are based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence, or [that] render a decision that cannot be located within the range of permissible decisions," *Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022). We may affirm a judgment, including one resulting from summary judgment, "on any ground that finds adequate support in the record." *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 52 F.4th 91, 95 (2d Cir. 2022).

## I.     28 U.S.C. § 2467

This case centers on 28 U.S.C. § 2467, which allows the Attorney General to, "upon request of a foreign nation pursuant to a mutual forfeiture assistance treaty, . . . petition a United States court to enforce a foreign forfeiture judgment." *United States v. Federative Republic of Brazil*, 748 F.3d 86, 88 (2d Cir. 2014). Upon receiving a request, the Attorney General or his or her "designee" determines whether to certify it as "in the interest of justice," a decision immune from judicial review. 28 U.S.C. § 2467(b)(2). Only foreign judgments that are "final" may be enforced. *Id.* § 2467(a)(2).

If a request is certified, the Government may file an application in district court "on behalf of a foreign nation . . . seeking to enforce" the foreign judgment "as if [it] had been entered by a court in the United States." *Id.* § 2467(c)(1). Any entity "affected by the forfeiture or confiscation judgment" may intervene as a respondent. *Id.*

11

§ 2467(c)(2)(A). Respondents may block enforcement of the foreign judgment by proving any of five enumerated affirmative defenses: (1) that the foreign judgment was rendered via "tribunals or procedures incompatible with the requirements of due process of law"; (2) that "the foreign court lacked personal jurisdiction over the defendant"; (3) that "the foreign court lacked jurisdiction over the subject matter"; (4) that the foreign nation failed to "take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property . . . sufficient time to enable him or her to defend"; and (5) that the foreign judgment "was obtained by fraud." *Id.* §§ 2467(d)(1)(A)-(E). If none apply, "[t]he district court shall enter such orders as may be necessary to enforce the judgment on behalf of the foreign nation," *id.* § 2467(d)(1), but is "bound by the findings of fact" of the foreign judgment in so doing, *id.* § 2467(e).

Section 2467 is unique in its role as a discretionary policy tool of international relations that courts apply within the otherwise routinized realm of asset forfeiture. This role informs our analysis of several issues of first impression raised by Appellants.

## II.    The Class's Affirmative Defenses

The Class asserts three affirmative defenses under § 2467(d)(1): (1) that "the foreign court lacked jurisdiction over the subject matter"; (2) that the Republic "did not take steps, in accordance with the principles of due process, to give notice of the [foreign] proceedings" to it "in sufficient time to enable [it] to defend"; and (3) that the "judgment was obtained by fraud." *Id.* §§ 2467(d)(1)(C)–(E). It also raises two generally applicable defenses: that the Government's application was (1) untimely; and (2) barred by Federal Rule of Civil

Procedure 41(a)(1)(B). We find that the Class failed to create a genuine dispute of material fact as to any of its defenses.

## A. Statute of Limitations

The Class argues that the Government's application is time-barred under 28 U.S.C. § 2462. As a threshold matter, we agree with the parties and district court that § 2462 applies here. It provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The Government's § 2467 application is indisputably "an action, suit or proceeding for the enforcement of a[] . . . forfeiture." *Id.*

The parties' agreements end there. They disagree about what the relevant "claim" is under § 2462 and when it accrued. The district court held that the operative claim is the enforcement application the Government filed in the district court under § 2467 on June 27, 2016, and that it accrued in January 2015, when the Republic asked the Attorney General to enforce the Philippine Judgment, making the application timely. *Arelma I*, 442 F. Supp. 3d at 758, 761-65. The Government defends this holding on appeal.

The Class argues that the limitations period should instead be measured with reference to the claim underlying the Philippine Judgment, which is the forfeiture claim the Republic brought in the Sandiganbayan. The Class argues that this claim accrued in 1972, when the Arelma Assets were deposited into the Merrill Lynch account; thus, this action, filed on June 27, 2016, is untimely.

13

### 1. "Claim" Defined

To locate the relevant claim, we must first examine the meaning of that term as used in § 2462. "Claim" can refer either to "the basis of a lawsuit or the lawsuit itself." *United States v. Ripa*, 323 F.3d 73, 82 n.10 (2d Cir. 2003). In the former sense, "claim" means the "factual situation that entitles one person to obtain a remedy." *Id*. In the latter, it is synonymous with "cause of action" and means "[a]n interest or remedy recognized at law; the means [to] obtain a privilege, possession, or enjoyment of a right or thing." *Claim*, *Black's Law Dictionary* (12th ed. 2024). Here, the term's location in § 2462, a statute of limitations, suggests that the "claim" could not proceed until the Attorney General certified the Republic's request to the Government to enforce the judgment it had obtained in Philippine court. *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("[O]ftentimes the meaning . . . of certain words or phrases may only become evident when placed in context."). "Claim" as used in statutes of limitations means that which accrues to start the limitations period, coming into existence "when the plaintiff has a complete and present cause of action." *Gabelli v. SEC*, 568 U.S. 442, 448 (2013).

The Class argues that the Government's § 2467 application is not an independent claim because it is substantively identical to the Philippine Judgment it seeks to enforce: the Government has no claim of its own to the Assets but is simply acting on the Republic's behalf. But these are different causes of action brought by different parties that offer different remedies and implicate different sets of facts. While the Republic's forfeiture claim sought to establish its right to the Assets, the Government's § 2467 application offers a distinct "remedy" in its enforcement. *Claim*, *Black's Law Dictionary* (12th ed. 2024). Further, while courts in § 2467 actions are bound by the foreign

judgment's findings of fact regarding its merits and scope, they must consider a different set of facts relating to its enforceability, including those relating to the foreign court's jurisdiction and procedural fairness. 28 U.S.C. §§ 2467(e), (d)(1)(A)-(E). Finally, the Class's argument ignores the independent policy interests the Government may (or may not) have in enforcement, which may only be sought on behalf of nations that are parties to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances or a "mutual forfeiture assistance" treaty or agreement, and only after a determination that enforcement serves the "interest of justice." *Id.* § 2467(a)(1), (b)(2); *see Federative Republic of Brazil*, 748 F.3d at 96 (the "interests of justice" requirement "ensures that the executive alone will weigh the foreign affairs implications of any enforcement action").

In an analogous context, courts widely view claims to enforce administrative penalties as distinct, for the purposes of § 2462, from the claims lodged to assess those penalties in the first place. *See FERC v. Vitol Inc.*, 79 F.4th 1059, 1064 (9th Cir. 2023) (joining First, Fourth, Sixth, Seventh, and Eighth Circuits in concluding that claims to enforce administrative penalties accrue under § 2462 "only *after* the agency has assessed such a penalty in an agency proceeding"); *but see United States v. Core Laboratories, Inc.*, 759 F.2d 480, 483 (5th Cir. 1985) (running § 2462 limitations period for enforcement action from the date of the underlying violation for which the penalty was assessed).[4]

---

[4] "Outside of the Fifth Circuit [in *Core*], no court has ever held that, in a case where an antecedent administrative judgment is a statutory prerequisite to the maintenance of a civil enforcement action, the limitations period on a recovery suit runs from the date of the underlying violation as opposed to the date on which the penalty was administratively imposed." *Vitol Inc.*, 79 F.4th at 1066 (noting *Core*'s

15

The Class prefers an analogy to 28 U.S.C. § 1963, which allows plaintiffs to register and enforce federal district court judgments in a different district. But it provides no authority suggesting that a § 1963 registration is not a claim in its own right. Instead, courts view § 1963 as "more than a mere procedural device for the collection of the foreign judgment." *Stanford v. Utley*, 341 F.2d 265, 268 (8th Cir. 1965). And § 2467 applications are more claim-like in any event because, unlike § 1963 registrations, they allow for fact-based affirmative defenses.

Finally, the Class suggests that a § 2467 action cannot constitute a standalone claim because it is initiated via "application" instead of complaint. 28 U.S.C. § 2467. But this argument is one of semantics, not substance. Several types of filings with different names can be used to bring claims in federal court, such as "petitions," "complaints," and "applications." *See, e.g.*, 28 U.S.C. § 2254 (federal courts "shall entertain an application for a writ of habeas corpus").

## 2. Accrual

The Class next argues that even if the operative claim under § 2462 is the Government's enforcement application, it accrued more than five years before the Government initiated this action on June 27, 2016. "[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action." *Gabelli*, 568 U.S. at 448. Section 2467 makes clear that the Government can only certify a request and apply for enforcement after the foreign judgment exists and is final and the foreign nation requests enforcement. 28 U.S.C. §§ 2467(a)(2), (b)(1). The satisfaction of these conditions gives the

---

"limit[ation] to the particular statute at issue"); *see United States v. Meyer*, 808 F.2d 912, 915 (1st Cir. 1987) (criticizing *Core*'s reliance on legislative history).

16

Government a "complete and present cause of action" and therefore marks accrual. *Gabelli*, 568 U.S. at 448.

The Class suggests instead that the claim accrued in 1972, when the Arelma Assets were deposited into the Merrill Lynch account. It relies on *Gabelli*, which fixed the accrual of certain SEC enforcement actions to "when a defendant's allegedly fraudulent conduct occurs." *Id.* But the statute in *Gabelli* empowered the SEC to seek penalties as soon as the underlying fraud occurred, not after a separate proceeding to show wrongdoing. *See id.* at 445 (citing 15 U.S.C. § 80b-9). *Gabelli*'s holding, that the limitations period in § 2462 begins to run "when a defendant's allegedly fraudulent conduct occurs" instead of when it is discovered, *id.* at 448, is confined to circumstances in which Congress allows an agency "to prosecute a violation by filing suit in federal court in the first instance," *Vitol Inc.*, 79 F.4th at 1064 (discussing *Gabelli*, 568 U.S. at 445-46). Here, by contrast, the Government cannot seek enforcement under § 2467 until a final foreign judgment exists. 28 U.S.C. § 2467(b)(1)(C); *see United States v. Meyer*, 808 F.2d 912, 914-15 (1st Cir. 1987) (holding that the term "enforcement" in § 2462 "presupposes the existence of an actual penalty to be enforced" and that an enforcement claim cannot accrue until liability has been assessed).

The Class warns that our holding would enable foreign nations to wait long periods before requesting enforcement. But while a foreign government may decide when to request enforcement, it cannot decide whether or when an enforcement application is actually brought. Only the Attorney General or their designee can do so after deciding whether a nation's request is "in the interest of justice." 28 U.S.C. § 2467(b)(2). A country that waits decades to request enforcement risks denial.

Finally, the Class argues that even if claims accrue from the date of the foreign country's enforcement request, the Government's application is still untimely because the Republic first requested enforcement in January 2010, six years before the Government brought this action. The letter to which the Class refers requested "the assistance of the appropriate authorities of the United States of America" to "assist in the return of the Arelma assets to the Republic, *should the Sandiganbayan judgment be affirmed by the Philippine Supreme Court*." Duran App'x 35, 39 (emphasis added). This request was, therefore, conditioned on the Sandiganbayan judgment being "affirmed by the Philippine Supreme Court"; because this condition was not met at the time of the January 2010 letter, the request was not perfected. Duran App'x 39. Further, the request did not enable the Government to file a § 2467 application because the foreign judgment was not yet "final"; it therefore cannot mark accrual. 28 U.S.C. § 2467(a)(2) (allowing enforcement of "a final order of a foreign nation").

## B. Federal Rule of Civil Procedure 41(a)(1)(B)

The Class next argues that the Government's application is barred under Rule 41(a)(1)(B) because of earlier lawsuits the Republic brought against Marcos and later dismissed. Rule 41(a)(1)(B) provides that a unilateral notice of voluntary dismissal "operates as an adjudication on the merits"—that is, a dismissal with prejudice—when "the plaintiff previously dismissed any federal- or state-court action based on or including the same claim." Fed. R. Civ. P. 41(a)(1)(B). This provision, known as the "two-dismissal rule," functions similarly to claim preclusion, blocking later-filed suits based on the same claim. *Jian Yang Lin v. Shanghai City Corp*, 950 F.3d 46, 50 (2d Cir. 2020) (per curiam). A subsequent action is "based on

18

or includ[es] the same claim" as the first when "it arises from the same transaction or occurrence." *Id.*

The Class argues that this action is based on the same claim as the Republic's lawsuits against Marcos from the 1980s that the Republic voluntarily dismissed. It asserts that the Philippine forfeiture action and the Republic's 1980s suits each sought an accounting of Marcos's ill-gotten wealth, and that the Government's § 2467 application shares this commonality because it is identical to the Philippine forfeiture claim. But the § 2467 claim does not "arise[] from the same transaction or occurrence" as the Philippine Judgment because, as discussed earlier, it seeks to enforce a pre-existing judgment and does not go to the merits of the underlying forfeiture action. *Id.*

The rationale behind the two-dismissal rule of Rule 41(a)(1)(B) likewise does not cover this case. Where the rule's "purpose . . . would not appear to be served by its literal application, and where that application's effect would be to close the courthouse doors to an otherwise proper litigant, a court should be most careful not to construe or apply the exception too broadly." *Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 534 F.2d 1012, 1017 (2d Cir. 1976). The rule's purpose, to prevent "abuse" and harassment stemming from the "unreasonable use of the plaintiff's unilateral right to dismiss an action," does not apply here. *Id.* Its application cannot be said to protect the Class, the party invoking it, from abuse, as the Class was not a defendant to the Republic's 1980s suits. The repeat litigation at issue here arises from the complexity inherent in international disputes over the assets of an ousted dictator, not a campaign of harassment on the part of the Republic.

19

**C. Subject Matter Jurisdiction**

A § 2467 respondent can prevent enforcement of a foreign judgment by showing that "the foreign court lacked jurisdiction over the subject matter." 28 U.S.C. § 2467(d)(1)(C). The district court rejected the Class's defense because the Class failed to show that the Philippine court lacked subject matter jurisdiction. It relied on the Sandiganbayan's holding, affirmed by the Philippine Supreme Court, that the Sandiganbayan had jurisdiction over the Arelma Assets after the Class declined to furnish evidence under Philippine law disputing that conclusion. *Arelma III*, 2023 WL 6449240, at *18.

**1. Choice of Law**

The Class challenges the district court's use of Philippine instead of American law to determine whether the Sandiganbayan had jurisdiction.[5] We hold that the district court properly applied Philippine law. It is dubious that an American court could practically apply American principles of subject matter jurisdiction, such as diversity and federal question jurisdiction, to foreign judgments. And the American jurisdictional principles that the Class asks us to apply here would undermine § 2467's purpose as a discretionary tool of international comity. The Class argues that the Sandiganbayan lacked in rem jurisdiction because it did not control the res at issue—

---

[5] While no circuit court has weighed in on this question, district courts have uniformly assumed that foreign law applies. *See In re One Prinz Yacht Named Eclipse*, No. 12-MC-162, 2022 WL 4119773, at *6 (D.D.C. Sept. 9, 2022) (using Spanish law to determine Spanish court's jurisdiction); *In re Enf't of Restraining Ord. by Ninth Fed. Ct., Fifth Jud. Subsection in Campinas, SP*, No. MC 15-783, 2024 WL 4854037, at *9 (D.D.C. Nov. 21, 2024) (Brazilian law); *In re Enf't of Restraining Ord. by Republic of India*, No. 22-MC-106, 2024 WL 5375481, at *3 (D.D.C. Nov. 18, 2024) ("[I]t is generally presumed that foreign courts have subject matter jurisdiction over the disputes they adjudicate.").

the Arelma Assets—which were located in the United States and in custody of the Hawaii district court. But if a foreign court cannot have jurisdiction to forfeit property located in the United States, then § 2467 could almost never be invoked. Its application would be limited to circumstances in which the disputed property is located within the foreign country at the time of the foreign forfeiture judgment before being subsequently moved to the United States, or where the foreign nation otherwise legally controlled the assets under preexisting seizure or attachment orders.

Our conclusion is further supported by the presumption against extraterritorial application, which teaches that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none, and reflects the presumption that United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013). "This presumption serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* Here, there is no indication that § 2467(d)(1)(C) seeks to extend the American law of subject matter jurisdiction to foreign adjudications. The Class's preferred holding would do so indirectly by denying foreign nations the ability to recover assets located on American soil unless their jurisdictional principles aligned with those of the United States.

### 2. Analysis under Philippine Law

The district court did not err in accepting the Sandiganbayan's conclusion as to its own jurisdiction under Philippine law. The Class argues that a U.S. court need not accept a foreign court's legal conclusions because this would render the jurisdictional defense contained in § 2467(d)(1)(C) null. But a mandate to apply foreign law

does not require U.S. courts to take a foreign court's jurisdictional holding at face value. The Class was free to furnish evidence that the Sandiganbayan lacked jurisdiction under Philippine law, as Roxas did, but chose not to do so. *Arelma III*, 2023 WL 6449240, at *18 & n.13. The district court therefore had no choice but to accept the Philippine courts' holdings in rejecting the Class's subject matter jurisdiction defense.

### D. Notice

A § 2467 respondent can prevent enforcement by showing that "the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property of the proceedings in sufficient time to enable him or her to defend." 28 U.S.C. § 2467(d)(1)(D). The district court rejected the Class's defense on these grounds because it held that the Class was not an interested party that was owed notice at the time the Philippine Judgment was issued.[6] It reasoned that the Supreme Court's decision in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), destroyed the Class's interest in the Assets before the Sandiganbayan issued its judgment, meaning that it could not have been injured by any lack of notice. *Arelma III*, 2023 WL 6449240, at *11-15. We agree.

### 1. Relevant Background of the Interpleader Action

Before analyzing the Class's notice defense, we must first examine aspects of the timeline of the Interpleader Action which bear on the question of notice. In 2004, the Hawaii district court in the Interpleader Action awarded the Arelma Assets to the Class, in partial

---

[6] The Class does not argue that it was entitled to notice based on any interest it acquired in the Arelma Assets after the Sandiganbayan's April 2009 judgment.

satisfaction of a $2 billion judgment the Class had previously won against Marcos's estate. *Merrill Lynch, Pierce, Fenner & Smith v. Arelma, Inc.*, No. CV00-595, 2004 WL 5326929, at *7 (D. Haw. July 12, 2004). The parties agree that this judgment gave the Class an interest in the Assets. The Republic appealed to the Ninth Circuit, arguing that it was an indispensable party to the Interpleader Action and that the Assets could not be awarded without its participation. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. ENC Corp.*, 464 F.3d 885, 890 (9th Cir. 2006). The Ninth Circuit rejected this argument and affirmed the Assets' award to the Class. *Id.* at 894.

The Supreme Court reversed in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). *Pimentel* held that the Republic was a required party to the Interpleader Action and that its sovereign immunity meant that it was prejudiced by the action's proceeding without its participation under Federal Rule of Civil Procedure 19. *Id.* at 864-67. Accordingly, it held that the Interpleader Action must be dismissed, thereby voiding the district court's award of the Assets to the Class. *Id.* at 873. Its mandate, which directed the Ninth Circuit to "order the United States District Court of the District of Hawaii to dismiss the interpleader action," issued on July 14, 2008. Dkt. July 17, 2008, Case No. 04-16401 (9th Cir.).

On remand from *Pimentel*, the Ninth Circuit ordered the Hawaii district court "to dismiss the interpleader action." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. ENC Corp.*, 535 F.3d 1010 (9th Cir. 2008). Before dismissing the Interpleader Action, however, the district court performed an "accounting" of the Arelma Assets in the fall of 2008, during which it held that the Class was entitled to certain interest accrued on the Assets. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Arelma, Inc.*, 587 F.3d 922, 924-25 (9th Cir. 2009). This

23

determination was swiftly reversed by the Ninth Circuit on November 13, 2009, which made clear that all of the Assets, including any accrued interest, were required to be returned to Merrill Lynch. *Id.* at 925. With this delay, the Assets were not returned until February 2010.

## 2. Whether the Class Was Owed Notice

The question here is whether the Class was owed notice of the Sandiganbayan proceedings to defend its interest in the Arelma Assets, awarded to it in the Interpleader Action, even though the Supreme Court's holding in *Pimentel* reversed that award before the Sandiganbayan handed down its judgment.

The Class argues that it only needed an interest in the Arelma Assets at the time the Republic moved for summary judgment in the Sandiganbayan against the Assets in order to be owed notice, because § 2467(d)(1)(D)'s purpose is to give parties "sufficient time to enable [them] to defend" their interest. Duran Br. 33-34 (quoting 28 U.S.C. § 2467(d)(1)(D)). But § 2467(d)(1)(D) is backward-looking—it asks courts to evaluate in hindsight whether the interested party was given an opportunity to participate in the foreign proceeding and, on this ground, to deny the enforcement of a judgment for which this opportunity was deprived. A party with no interest in the contested property at the time of the foreign judgment cannot be said to have been deprived of anything. Even though the Class had an interest in the Assets at the outset of the Philippine proceedings, *Pimentel* destroyed this interest before the Sandiganbayan issued its judgment, thereby rendering the Class's ability to defend that interest meaningless. The Class analogizes to Article III standing, under which a plaintiff's stake in the outcome of litigation is measured as of the suit's outset. *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025).

24

But that stake must be maintained throughout all stages of litigation in order for the case not to be moot. *Id.* Similar logic applies here: a party who loses its interest in the forfeited property before the foreign forfeiture judgment is issued no longer has a need to defend itself in the foreign proceeding and, accordingly, its entitlement to notice is rendered effectively moot.

Having decided that the Class needed an interest in the Assets when the Sandiganbayan ordered their forfeiture on April 2, 2009 in order to be owed notice under § 2467(d)(1)(D), we now examine whether it had an interest on that date. It did not. Although the district court in the Interpleader Action initially awarded the Class the Assets in 2004, the Supreme Court in *Pimentel* reversed this judgment and destroyed the Class's interest once its mandate issued on July 14, 2008, eight months before the Philippine Judgment. The Class therefore had no interest in the Assets deriving from this award at the time of the Philippine Judgment.

The Class argues that its interest in the Assets persisted after *Pimentel* because the district court, on remand from *Pimentel*, did not return the Assets to Merrill Lynch until February 2010—after the Philippine Judgment issued in April 2009. We disagree that this delay in actualizing *Pimentel*'s mandate prolonged the Class's interest in the Assets. Any ownership the Class had over interest accrued on the Assets awarded by the Hawaii district court was rendered void *ab initio* by the Ninth Circuit's decision reversing that award in *Merrill Lynch*, 587 F.3d at 924-25. "It has long been well established that the reversal of a lower court's decision sets aside that decision . . . and requires that it be treated thereafter as though it never existed." *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) (citing *Butler v. Eaton*, 141 U.S. 240, 244 (1891)); *see Concilio de Salud Integral de*

*Loiza, Inc. v. Perez-Perdomo*, 625 F.3d 15, 19 (1st Cir. 2010) ("Reversing an . . . injunction often warrants treating the injunction thereafter as if it did not exist in the period before the vacation."). Even though the Ninth Circuit did not act until after the Philippine Judgment issued, the Class's interest was void from the beginning.

**E. Fraud**

Section 2467(d)(1)(E) allows a party to prevent enforcement of a foreign forfeiture judgment by showing that the judgment "was obtained by fraud." 28 U.S.C. § 2467(d)(1)(E). The Class argues that the Republic secured the Philippine Judgment by fraud because it concealed certain obligations it had involving the Arelma Assets that arose from an earlier settlement with a Marcos associate.

**1. Type of Fraud Contemplated by § 2467(d)(1)(E)**

We must first determine which type of fraud is contemplated by § 2467(d)(1)(E), another question of first impression. The district court adopted the standard applicable to collateral actions to set aside a judgment on the basis of "fraud on the court" under Federal Rule of Civil Procedure 60(d)(3). *Arelma III*, 2023 WL 6449240, at *15. The parties do not contest this interpretation and we agree that a modified Rule 60(d)(3) standard is appropriate here. Rule 60(d)(3) is analogous to § 2467(d)(1)(E) because both allow parties to attack a judgment collaterally, and § 2467(d)(1)(E)'s reference to judgments "obtained by fraud" connotes misconduct directed at a court instead of an adverse party.

Fraud on the court under Rule 60(d)(3) embraces a narrow and extreme set of conduct "which . . . defile[s] the court itself so that the judicial machinery can not perform in the usual manner." *Mazzei v. The Money Store*, 62 F.4th 88, 93 (2d Cir. 2023). It requires showing

that (1) "the defendant interfered with the judicial system's ability to adjudicate impartially"; and (2) "the acts of the defendant must have been of such a nature as to have prevented the plaintiff from fully and fairly presenting a case or defense." *Id.* at 93-94. The second element is inapplicable here because the Class was not a party to the foreign proceeding.

### 2. Whether the Philippine Judgment Was Obtained by Fraud

The Class's theory of fraud centers on a 1986 settlement between the Republic and Jose Campos, a Marcos associate who established shell companies to hold Marcos's stolen assets. In May 1986, the Republic settled claims against Campos, recovering assets worth $115 million (the "1986 Settlement"). The Class argues that this settlement fully satisfied the Republic's only claim to the Arelma Assets: that they were the product of a conspiracy by Marcos and Campos to steal and hide the Republic's funds. It also maintains that a 1989 Philippine Supreme Court decision required that the Campos settlement be applied as a credit toward future damages assessed against Marcos as a joint tortfeasor in that scheme. The Class argues that these obligations made it fraudulent for the Republic to move for summary judgment before the Sandiganbayan without informing it of (1) the 1986 Settlement or (2) the credit against Marcos's liability, thereby seeking double recovery for the Assets.

The Class fails to create a genuine dispute that these allegations are true, let alone that they constitute "fraud which . . . attempts to defile the court." *Id*. First, the Republic did inform the Sandiganbayan of the 1986 Settlement. The Class acknowledges that the Republic attached a letter detailing the settlement and its "main points" to its 1991 forfeiture petition. Duran Br. 47; Duran App'x 363-

64. And the Philippine Judgment acknowledged that the forfeiture proceedings concern "[p]roperties surrendered to the [Republic] by Marcos crony Jose Y. Campos." Duran Sp. App'x 143 n.25. The Class is right that the bounds of fraud on the court are "characterized by flexibility which enables it to meet new situations," and this is certainly a unique situation. *Leber-Krebs, Inc. v. Capitol Recs.*, 779 F.2d 895, 899 (2d Cir. 1985). But the Republic could not have defrauded the Sandiganbayan by withholding information that the Sandiganbayan already knew.

Finally, the Class's argument regarding the "credit" Marcos was owed by the Campos settlement is unpersuasive. The Class finds fault in the Republic's "permit[ing] [the Sandiganbayan] to assume that the Arelma funds were somehow not to be credited against the joint liability of Campos and Marcos," thereby preventing it "from applying the accepted law of crediting payments by one joint tortfeasor against the remaining obligations of non-settling tortfeasors." Duran Reply Br. 13. As noted above, the Republic did not hide the settlement's existence or terms. What remains is an accusation that the Sandiganbayan legally erred in failing to apply principles of joint and several liability, not an accusation that the Republic "interfered with" its "ability to adjudicate impartially." *Mazzei*, 62 F.4th at 94. The Class's notice defense therefore fails.

## III. The Class's Requests to Limit Enforcement

In addition to its affirmative defenses, the Class also argues that the Philippine Judgment, if enforced, should be limited as to the amount of the Assets and custodians to which it pertains. While the Class styles these arguments as affirmative defenses, they are not found in §§ 2467(d)(1)(A)-(E). Section 2467(d)(1) instructs that, if no affirmative defenses apply, the court "shall enter such orders as may

28

be necessary to enforce the judgment on behalf of the foreign nation." 28 U.S.C. § 2467(d)(1). We agree with the district court that the Class's arguments are better understood as requests to define the scope of the orders that are "necessary to enforce the judgment." *Id.* § 2467(d)(1); *Arelma III*, 2023 WL 6449240, at \*20.

### A. Limitation as to Amount

The Class first argues that the district court erred in refusing to limit enforcement of the Philippine Judgment to $3,369,975, the amount in the Merrill Lynch account as of 1983. The Sandiganbayan's 2009 judgment ordered the forfeiture of "all the assets, investments, securities, properties, shares, interests, and funds of Arelma, Inc., presently under management and/or in an account at the Meryll [sic] Lynch Asset Management, New York, U.S.A., in the estimated aggregate amount of US$3,369,975.00 as of 1983, plus all interests and all other income that accrued thereon." Duran Sp. App'x 168. The Philippine Supreme Court's affirmance contains nearly identical language as to the estimated amount.

Section 2467(a)(2) allows for the enforcement of two types of forfeiture judgments: those compelling a person or entity (A) "to pay a sum of money representing the proceeds of" certain crimes; and (B) "to forfeit property involved in or traceable to the[ir] commission." 28 U.S.C. §§ 2467(a)(2)(A)-(B). In other words, the Government can enforce a judgment denoted in terms of an amount of currency or a specific piece of property.

The Class insists that "property" as used in the statute can only refer to tangible goods and not assets of an undefined value, such as the contents of a bank account. We see no reason why a bank account cannot qualify as "property" under § 2467 as it can in other forfeiture

29

contexts. *See, e.g.*, *United States v. Watts*, 786 F.3d 152, 174-76 (2d Cir. 2015) (bank accounts considered "property" under 21 U.S.C. § 853); *United States v. Technodyne LLC*, 753 F.3d 368, 373 (2d Cir. 2014) (19 bank accounts forfeited as "property . . . traceable to" criminal acts under 18 U.S.C. § 981(a)(1)).

The Class argues that forfeiting a bank account as property would render § 2467(a)(2)(B)'s separate reference to "a sum of money" superfluous. But § 2467(a)(2)'s structure replicates the long-established distinction between forfeiture of property and money judgments, such as in Federal Rule of Criminal Procedure 32.2. Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption (noting that Rule 32.2(b)(1) "recognizes that there are different kinds of forfeiture judgments in criminal cases," those "for a sum of money" and those for "a specific asset"). Here, the Sandiganbayan's judgment falls under § 2467(a)(2)(B) because it references "[a]ll assets, properties, and funds belonging to Arelma, S.A." Duran Sp. App'x 183; *see* Duran Sp. App'x 168. Its reference to the amount of money in the account as of 1983 serves only to identify the account; it does not transform the judgment into a money judgment.

The Class next suggests that the Philippine judgment must be expressed in terms of a "sum certain" under New York law in order to be enforceable. Its winding path to this position is as follows: § 2467(d)(2) states that the "[p]rocess to enforce a judgment under this section shall be in accordance with [Federal Rule of Civil Procedure] 69(a)," 28 U.S.C. § 2467(d)(2), and Rule 69(a) states that "[a] money judgment is enforced by a writ of execution," and that that procedure "must accord with the procedure of the state where the court is located," Fed. R. Civ. P. 69(a). Section 5302(a)(1) of the New York Civil Practice Law and Rules, in turn, supplies the procedure for

writs of execution in New York, allowing the execution of "a foreign country judgment . . . of a sum of money." N.Y. C.P.L.R. § 5302(a). The Class suggests that this reference to "a sum of money" requires that the foreign judgment be denoted in terms of a "sum certain" in order to be enforceable via § 2467.

This argument confuses the means by which the Government may obtain a judgment under § 2467 and those by which it can execute said judgment on U.S.-based property. Even if the process for executing a pre-existing federal judgment under § 2467 on New York property is governed by C.P.L.R. § 5302, New York law has nothing to do with the substantive standard for obtaining § 2467 relief—which itself enforces a foreign judgment—in the first place. That standard is supplied by § 2467 itself. *See* 28 U.S.C. § 2467(d).

## B. Limitation as to Custodian

The Class next attempts to exploit a clerical error in the Sandiganbayan's judgment to nullify the Government's application. Because the Sandiganbayan's decretal judgment refers to "an account at Meryll [sic] Lynch Asset Management," it argues, the judgment should be limited to funds that were held at that institution. Duran Br. 14; Duran Sp. App'x 168. The Sandiganbayan's reference to "Meryll [sic] Lynch Asset Management" is an apparent clerical error, as the Assets were actually held by Merrill Lynch, Pierce, Fenner & Smith, Inc., a different entity, before being transferred to New York State in 2017. Duran Sp. App'x 168. This error was corrected by the Philippine Supreme Court, which eliminated the Sandiganbayan's reference to a specific custodian in its 2012 affirmance. Duran Sp. App'x 183.

The Class only hints at this argument in its opening brief, providing the relevant factual background in its "Statement of the Case" section, before explicitly arguing the point for the first time in its reply. Federal Rule of Appellate Procedure 28(a)(8) requires appellants to state their contentions in their opening brief. Fed. R. App. P. 28(a)(8)(A). "[A]rguments not raised in an appellant's opening brief, but only in his reply brief, are not properly before an appellate court." *McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005) (also observing that "[t]o the extent that an unexpressed challenge . . . may have been hidden between the lines of petitioner's brief, it is not our obligation to ferret out a party's arguments"). This argument is abandoned; we decline to entertain it.

## VI. Roxas's Standing

Roxas challenges the district court's grant of summary judgment against her on the grounds that she lacked Article III standing to contest the enforcement of the Philippine Judgment. The district court held that while Roxas had a cognizable interest in the proceeds of the Yamashita Treasure, she failed to show that this interest translated to one in the Arelma Assets. *Arelma III*, 2023 WL 6449240, at *11. We agree with the district court.

### A. Applicable Law

Article III of the Constitution limits federal court jurisdiction to "Cases and Controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Standing gives teeth to this limitation: it "help[s] ensure" that the party bringing suit "has such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). An intervenor as of right like Roxas "must have Article III standing in order to

pursue relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017). On summary judgment, a party must establish standing "by affidavit or other evidence specific facts" demonstrating "a genuine issue regarding standing." *Lugo v. City of Troy*, 114 F.4th 80, 88 (2d Cir. 2024).

The standing inquiry for forfeiture claimants is two pronged. "The nature of a claimant's asserted property interest is defined by the law of the State– or . . . nation– in which the interest arose," while "federal law determines the effect of that interest on the claimant's right to bring a claim." *United States v. All Assets Held at Bank Julius*, 480 F. Supp. 3d 1, 13 (D.D.C. 2020) (collecting cases); *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 33 (1st Cir. 1999) (holding same). While "an owner of property seized in a forfeiture action will normally have standing," as will parties who possess the property or have a "financial stake" in it, the ultimate question is whether this interest is such that the property's forfeiture would create "an injury that can be redressed at least in part by" its return. *Cambio Exacto*, 166 F.3d at 527-28. Because forfeiture claimants do not invoke federal jurisdiction in the same way as a traditional civil plaintiff, but merely "ensure that the government is put to its proof" regarding its claim, we have characterized the applicable standing inquiry as "truly threshold only," requiring only a "facially colorable interest" in the proceedings. *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78-79 (2d Cir. 2002) (explaining that claimants need not "ultimately prove[] the existence of" their claimed interest). That reasoning applies equally here, where the Government seeks to enforce a foreign forfeiture judgment under § 2467, and Roxas has intervened as a respondent only to oppose enforcement. *See* 28 U.S.C.

§ 2467(c)(2)(A) ("the defendant or another person or entity affected by the forfeiture . . . shall be the respondent" in § 2467 actions).

We proceed to identify Roxas's interest in the Assets under state law and assess whether this interest is sufficient for standing under the above-stated principles of federal common law.

## B. Roxas's Interest in the Assets under New York Law

Roxas asserts an interest in the Arelma Assets by way of Roger Roxas's former ownership of portions of the Yamashita Treasure that were stolen by Marcos.[7]  She contends that Roger Roxas had a continued ownership interest in the proceeds of the treasure under New York and Philippine law and that these proceeds formed part of Marcos's $2 million Arelma deposit in 1972.  The Government does not dispute Roxas's ownership of proceeds of the portion of the treasure stolen from Roger Roxas by Marcos.  Instead, the parties contest whether those proceeds are traceable to Marcos's 1972 deposit, and therefore the Arelma Assets, such that Roxas has an interest in them as well.  Roxas claims an interest in the Assets under both New York and Philippine law.[8]  We disregard Roxas's argument under Philippine law, which does not allege any link to the Assets, and instead examine her claim that she has an interest under New York law via a constructive trust.

Under New York law, "when property has been acquired in such circumstances that the holder of the legal title may not in good

---

[7] Roxas acknowledges that she cannot establish a sufficient interest in the Arelma Assets solely based on her judgment against the Marcoses for the theft of the treasure.

[8] The Government does not respond to Roxas's argument that either Philippine or New York law could govern Roxas's interest in the Arelma Assets.

conscience retain the beneficial interest, equity converts him into a trustee." *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978). More generally, a "constructive trust is an equitable remedy" employed to "prevent unjust enrichment." *Homapour v. Harounian*, 182 A.D.3d 426, 427 (1st Dep't 2020). Beneficiaries of a constructive trust have Article III standing to contest forfeiture of the trust property. *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158-60 (2d Cir. 1994). "[B]efore a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985). The New York Court of Appeals has held that the "inability to trace plaintiff's equitable rights precisely should not require that they not be recognized, much as in the instance of damages difficult to prove," *Simonds*, 45 N.Y.2d at 240, and so courts should "relax the tracing requirement in exceptional circumstances," *Rogers v. Rogers*, 63 N.Y.2d 582, 587 (1984); it has not, however, explained which circumstances qualify as exceptional.

Despite the lack of guidance from New York courts, the circumstances here are "exceptional" by any reasonable measure. *Id.* The Assets have passed through several people, corporations, countries, and decades, and are undoubtedly the proceeds of malfeasance. We therefore opt to relax, but not eliminate, the tracing requirement. The same conclusion was reached by a district court in an interpleader action over other property purchased with funds misappropriated by the Marcoses, in which Roxas and the Republic participated. *Dist. Att'y of N.Y. Cnty. v. Republic of the Philippines* (*DANY*), 307 F. Supp 3d 171, 208-09 (S.D.N.Y. 2018). *DANY* denied the Republic summary judgment on Roxas's attempt to recover the property under a theory of constructive trust under New York law. *Id.* at 205-06, 208-09. Given Marcos's efforts to hide his crimes and the

decades that had elapsed, it found "exceptional circumstances" warranting relaxed tracing. *Id.* at 208-09 (citing *Rogers*, 63 N.Y.2d at 587). Though not binding, we find the *DANY* court's reasoning persuasive and proceed to evaluate Roxas's evidence on summary judgment under relaxed tracing.

### 1. Roxas's Evidence

To show tracing, Roxas relies on two pieces of evidence and the facts affirmed by the Hawaii Supreme Court in the Hawaii Tort Action, *Roxas v. Marcos*, 89 Haw. 91 (1998). Both parties assume the veracity of the facts affirmed in that case. Roxas primarily relies on deposition testimony from John Buckley, a now-deceased forensic accountant, taken during the Interpleader Action. Buckley had examined Marcos's tax returns, documents found in the Philippine presidential palace, and other financial records. Roxas Br. 30; Roxas App'x 2555. He testified that the funds constituting the Arelma deposit had been wired to a Swiss shell foundation under Marcos's pseudonym before being "transferred to Panama" and "deposited with Merrill Lynch." Roxas App'x at 2556. Buckley could not remember, however, whether he had "traced the source of the two million dollars" before their arrival in Switzerland. *Id.* at 2568.

Buckley stated that "the most probable source" for those funds originally was "the treasure that was uncovered in the Philippines." *Id.* at 2565-66, 2568. He reasoned that because Marcos's tax returns did not reflect comparable legitimate wealth, and because he "doubt[ed] that [Marcos] would have generated that much through legitimate activity," the source of the deposit must have been illegitimate. *Id.* at 2566. Buckley was "not sure" whether there could have been an illegitimate source other than the treasure. *Id.* at 2568. He named as other options "reparations that the Philippines received

from Japan" and "various aid money that the U.S. sent to the Philippines," but cautioned that these sources would be "more closely scrutinized by the Philippine government" and "small in comparison to the treasure." *Id*. Buckley noted, however, that he "was not asked to investigate the Japanese treasure" and had not "seen sufficient documentation" to "reliably conclude that the source of the two million dollars" was illicit. *Id.* at 2569-70.

Roxas also points to the opening statement of Gerry Spence, an attorney for Marcos's widow Imelda Marcos, during a 1990 trial in New York. Spence claimed that a witness would testify "that part of [Marcos's] wealth came from the discovery of what is called the Yamashita gold hoard." Roxas App'x 2242.

### 2. Admissibility

The parties contest the admissibility of the Buckley testimony and Spence's statements. The district court found the Buckley testimony inadmissible and, in any event, unpersuasive as to Roxas's interest in the Assets. *Arelma III*, 2023 WL 6449240, at *8-9. It declined to rule on the admissibility of the Spence statements, holding that they were unpersuasive regardless. *Id.* at *9. We agree with the district court that Spence's statement is unpersuasive. The statement echoes Buckley's assertions that Marcos took and sold gold, including from the treasure, but provides no details as to specific gold sales or their timing, nor does it cast doubt on other potential sources of the Assets. We therefore review only the admissibility of the Buckley testimony.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Picard*, 49 F.4th at 181. The

district court found the Buckley testimony inadmissible on three independent grounds: it (1) did not qualify under the exception to the hearsay rule provided by Federal Rule of Civil Procedure 32(a)(8); (2) was expert testimony that Roxas failed to disclose; and (3) was speculative. *Arelma III*, 2023 WL 6449240, at *8-9. We conclude that the district court's exclusion of the testimony was justified by its speculative nature and need not address its other grounds for exclusion.

"An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *see Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) ("expert testimony should be excluded if it is speculative or conjectural").[9] While Buckley examined transfers of the $2 million between shell corporations and bank accounts prior to its deposit in New York, he could not remember whether he had traced it before its arrival in a Swiss bank account. Roxas App'x at 2568. When asked specifically whether he believed that the Arelma Assets were "stolen from others," Buckley replied "I don't know that . . . . I think there's a presumption that that money came from other sources, and the most probable source is the treasure." *Id.* at 2565. Crucially, Buckley admitted that he "was not asked to trace gold or the treasure," *id.* at 2568; instead, his conclusion as to the Assets' likely source was based on (1) the lack of legitimate income reflected on Marcos's tax documents; and (2) the relative difficulty that Buckley presumed that

---

[9] Roxas argues that she sought to use Buckley as a fact witness instead of as an expert. Even assuming that Buckley could be considered a fact witness in relation to the financial documents he personally reviewed, he admitted that his conclusions as to the Assets' likely source was not based on this review.

Marcos would face in stealing other large sums, such as foreign aid and reparations. *Id.* at 2565-68. At best, Buckley's conclusion was a negative inference based on educated speculation. The district court did not abuse its discretion in finding it conjectural.

### 3. Analysis of Roxas's Remaining Evidence

Roxas's remaining evidence fails, even under a relaxed tracing standard, to create a genuine dispute as to whether the Assets are traceable to the portion of the treasure that was stolen from Roger Roxas. Roxas points out that the 1971 raid in which Marcos stole the treasure was the first judicially confirmed incident of Marcos seizing property from a citizen, and that the deposit occurred shortly after Marcos first declared martial law, making it less likely that the deposit included different ill-gotten funds. She also points to the gap of some eighteen months between the treasure's theft and the Arelma deposit. But given the scale of Marcos's thefts, the general timing of his criminal activity alone, without any evidence casting doubt on alternative potential sources for the deposit, is not enough to show that the Arelma deposit stemmed from any specific incident.

\* \* \*

Because we hold that Roxas lacked standing to assert any affirmative defenses, we need not address whether the district court properly denied her motion to amend her answer to add further defenses.

## V.  GBC's Motion to Intervene

The district court rejected GBC's request to intervene on January 14, 2020. To be granted intervention under Federal Rule of Civil Procedure 24, an applicant must, among other things, "show

that the[ir] interest is not protected adequately by the parties to the action." *Floyd v. City of New York,* 770 F.3d 1051, 1057 (2d Cir. 2014) (per curiam). The district court denied GBC intervention on multiple grounds, including that its interests would be adequately represented by Roxas, as they share counsel and are otherwise affiliated.

The district court did not abuse its discretion. A prospective intervenor's burden in demonstrating that their interest is not adequately protected is "minimal," but becomes more burdensome "where the putative intervenor and a named party have the same ultimate objective." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001). GBC and Roxas have the same objective here: to prevent enforcement of the Philippine Judgment. Roxas argues that this common interest did not exist at the time the district court weighed GBC's intervention request because Roxas had not yet been granted intervention as a named party. But the district court ruled on GBC's motion only after granting Roxas respondent status, which it made retroactive to 2016. Roxas Sp. App'x 88-89. And Roxas does not explain how GBC's exclusion substantively impacts its interests. Finally, even though Roxas is no longer in the case for lack of standing and therefore may not be said to advance a shared objective, the district court also found that GBC lacked Article III standing for the same reason as Roxas—its inability to connect any claim it had to the treasure with one to the Assets. We agree with the district court.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.